United States Courts
Southern District of Texas
FILED

IN THE UNITED STATES FEDERAL COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

*11/02/2020*

David J. Bradley, Clerk of Court

JOHN E. HALL,

Plaintiff,

V.

THE CITY OF HOUSTON,

MAYOR SYLVESTER TURNER

HOUSTON POLICE CHIEF, ART ACEVEDO

POLICE ATTORNEY, KRISTIE L. LEWIS

FORMER CITY ATTORNEY ANTHONY HALL

FORMER MAYOR LEE P. BROWN

FORMER POLICE OFFICER MAY WALKER

FORMER EXECUTIVE CHIEF MICHAEL DIRDEN

GAYLAND MALVEAUX

FORMER POLICE CHIEF C.O. BRADFORD

FORMER ASSISTANT CHIEF J. DOTSON

JOHN DOE MEMBERS OF THE HOUSTON POLICE DEPARTMENT

Defendants,

20-3740

Cause No.

1

## COMPLAINT TO RECOVER DAMAGES FOR
## DEPRIVATION OF CIVIL RIGHTS AND PERSONAL INJURY

### JURISDICTION AND VENUE

Plaintiff brings this complaint under the Conspiracy to deprive civil rights by violating first, fourth, fifth, sixth, and fourteenth amendment rights under 42 U.S.C. Section 1983 and Police Code of Silence, 42 U.S.C. 1985 and Police Code of Silence, 42 U.S.C. 1981 and Police Code of Silence, and the conspiracy to commit Fraud, conspiracy to violate a fiduciary duty, conspiracy to commit fraudulent concealment, conspiracy to violate the Law Enforcement Police Bill of Rights, Conspiracy to Violate Title III 18 USC 2510-2521 and 18 USC 3122-3123 laws, Conspiracy to use String Ray cell phone tracking devices, and conspiracy to violate Title VII 1964, Post-employment retaliation laws. Venue is proper in this judicial district in terms of law violations and place of occurrence within this district.

### PARTIES

1. Plaintiff John E. Hall is an individual who is a resident of Spring, Texas in Harris County, Texas, in the State of Texas.

2. Defendant City of Houston is a municipality in the State of Texas.

3. Defendant Sylvester Turner is the Mayor of Houston, Texas.

4. Defendant Art Acevedo, is the Chief of Police. Defendant was acting under the color of state and federal laws and in the course and scope of his employment as a law enforcement officer with the City of Houston at all material times.

5. Defendant Kristie Lewis, is a police attorney for the Houston Police Department. Defendant was acting in the course and scope of her employment with the City of Houston at all material times.

2

6. Defendant Anthony Hall, was the City Attorney, who presided over the Edward's Affirmative Action Lawsuit and approved the promotional list.

7. Defendant Mae Walker, was the Afro-American Police Officers' Union President

8. Anonymous Defendants members of the Houston Police Department working in Internal Affairs Division were acting under the color of state and federal laws and in the course and scope of their employment as police officers with the City of Houston at all material times.

9. Gayland Malveaux is a citizen who engaged in a conspiracy with the Houston Police Department to make false and misleading statements about plaintiff as part of a scheme to disqualify him from an affirmative action promotion.

10. Lee P. Brown, former Mayor of Houston, is a final policy decision maker, who was notified of police misconduct and retained Anthony Hall as City Attorney under Edward's Affirmative Action lawsuit.

11. Jimmy Dotson, former Houston Police Assistant Chief, at time of incident referenced in May 31, 2018 letter, was acting under the color of state and federal laws and in the course and scope of his employment at all material times.

12. C.O. Bradford, former Houston Police Chief, at time of incident was an Assistant Chief and Chief of Police, Sam Nuchia.  Defendants were acting under the color of state and federal laws and in the course and scope of his employment at all material times.

13. Michael Dirden, former executive Chief of Police, at time of incident was acting under color of the state and federal laws and in the course and scope of his employment at all material times.

14. Renita Ferguson, former sergeant with the Houston Police Department, at time of incident was acting under color of the state and federal laws in the course and scope of her employment at all material times.

**BACKGROUND SUMMARY**

Plaintiffs hereby incorporate paragraphs 1 through 4  as if fully set forth herein.

15. Plaintiff, who was under a collective bargaining agreement, claims that defendants engaged in an ongoing conspiracy of discrimination and retaliation by failing to notify plaintiff of  wiretap, pen register, sting ray investigations  associated with a (false) criminal complaint as referenced in the May 31, 2018 letter by the police attorney and approved by Chief Acevedo. As a result of defendants' failure to notify plaintiff, **there was never a date when the criminal investigations ended, nor a time when the retaliation stopped.** Defendants continued to share the content of their criminal investigations to police agencies and others for **24 years** in order to present plaintiff in a "false light" by fraudulently concealing material facts of their conspiracy. Based on defendants unlawful actions, Plaintiff was deprived of his constitutional rights under the first, fourth, fifth, sixth, and fourteenth  amendments which resulted in loss of employment, interference in employment contract(s), as well as others with respect to  formulation, terms, conditions,  and enjoyment, damage to his reputation, intentional infliction of emotional distress, humiliation, pain,  embarrassment,

4

suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of

earning, and loss of future earnings due to defendants' failure to notify him

of the final disposition of the criminal complaint.  Since there was no final

disposition date, plaintiff was subject to "double jeopardy" every time the

content of the criminal investigation was shared. Defendants used the

criminal investigation as retaliation and as a distraction from the originate

crime which triggered the Conspiracy. The "real" crime that triggered the

conspiracy was when the former City Attorney Anthony Hall perpetrated

**Fraud on the Court** by tampering with the Federal Judge's promotional

list by placing and approving a non-qualifying co-conspirator on the list to

replace plaintiff.  Plaintiff invokes all rights under fraudulent concealment.

16. Plaintiff informs the Court that he received a May 31, 2018 correspondence informing
    him of a criminal investigation involving wiretaps and pen registers in accordance with
    the Texas criminal code articles 18.20 and 18.21. Prior to the May 31, 2018
    notification, Plaintiff never was informed of any criminal investigation. Note:
    Defendants omitted the use of Sting Ray cell phone tracking and surveillance devices
    which do not require Court approval, which incentivizes the potential for
    unconstitutional government surveillance.  Sting Rays can identify, locate, track, and
    access a cell phone's data without being stationery. A police unit can sit outside your
    residence and intercept your tower signal without your knowledge. The captured data
    includes text messages, email, and voice messages. HPD has had this electronic
    surveillance technology since 2007. Plaintiff alleges that defendants could also be using
    Sting Ray technology illegally.

17. Plaintiff believes that this criminal investigation was fabricated as part of a conspiracy to disqualify plaintiff from an affirmative action promotion based on racial discrimination. Plaintiff recalls **two white co-workers** informing Plaintiff that the department was trying to disqualify him from an affirmative action promotion. Plaintiff wrote a letter to the Chief of Police claiming a hostile work environment due to ongoing supervisory harassment at work, strict supervision, change in performance evaluation, and assigning other officers to conduct field surveillance on me. After the letter, I received the promotion but the harassment resulted into racial slurs such, "you're a welfare lieutenant" by two white officers. After filing an administrative complaint, **two white captains** claimed that he was acting "erratic" at work and my assignment was changed. Plaintiff forwarded three psychological statements to his captain to refute the false allegations made against him. Immediately, plaintiff received a call from the internal affairs division that he was relieved of duty. Plaintiff asked for what and the internal affairs sergeant said, we'll think of something. The **Chief of Police was white**.

18. Plaintiff filed EEOC complaint 330-952-687 for a hostile work environment, discrimination, and retaliation.

19. At the time of the EEOC complaint, plaintiff did not know that defendants had already initiated a conspiracy to disqualify plaintiff involving a criminal investigation. An event that possible occurred 24 years ago.

20. Plaintiff claims defendants violated his constitutional rights under 42 U.S.C. 1985 (3) and the police code of silence which reads: Section 1985 (3) permits an action to be brought by one injured by a conspiracy formed 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the **equal protection** of the

laws, or of equal privileges and immunities under the laws'. Thomas v. Independence Twp., 463 F.3d 285, 298 (3d Cir.2006).

21. Accordingly to Wikipedia,  In criminal law, a **conspiracy** is an agreement between two or more persons to commit a crime at some time in the future. Criminal law may require that at least **one overt act** be undertaken in furtherance of that agreement, to constitute an offense. There is no limit on the number participating in the conspiracy. For the purposes of concurrence, the *actus reus* is a continuing one and parties may join the plot later and incur joint liability. Finally, repentance by one or more parties does not affect liability (unless, in some cases, it occurs *before* the parties have committed overt acts) but may reduce their sentence. Defendants engaged in multiple conspiracies.

22. Plaintiff did not discover the key decision maker to the conspiracy to disqualify him until **9-27-20**. Plaintiff discovered that former City Attorney Anthony Hall was part of the conspiracy to disqualify him. Co-conspirator Anthony Hall knowingly and intentionally committed the **overt act** of placing and approved co-conspirator Renita Ferguson on the promotional list contrary to the selection criteria established by the Federal Judge. Parties to the immediate conspiracy involved the former City Attorney Anthony Hall, Sergeant Ferguson, and plaintiff's ex-wife, Gayland Malveaux. Carol Hall, the wife of Anthony Hall, were close friends of Kay Mouton, the sister of plaintiff's ex-wife Gayland Malveaux. All three women are school teachers. Kay Mouton and Carol Hall teach at the same school. Malveaux and Ferguson are friends.

7

Ferguson and former City Attorney Anthony Hall are friends, as well as Mayor

Brown, former Chief Bradford, and former Chief Dodson. Ferguson was the

administrative sergeant for Chief Dodson.

23. Defendants fraudulently concealed the **tampered government promotional list** from

plaintiff until Oct.26, 2019. Defendants fraudulently concealed the criminal

investigation using wiretaps and pen registers from plaintiff until May 31, 2018.

Defendants fraudulently concealed both material facts from plaintiff's EEOC

investigator, who was Investigating plaintiff's discrimination and retaliation

complaint under EEOC complaint 330-952-687 (1995).

24. Plaintiff alleges that defendants violated 18 **U.S.C.** § 1503 which defines "**obstruction**

**of justice**" as an **act** that "corruptly or by threats or force, or by any threatening letter or

communication, influences, obstructs, or impedes, or endeavors to influence, **obstruct**, or

**impede, the due administration of justice,** " when they fraudulently concealed both the

tampered promotional list and the criminal investigation referred in the May 31, 2018

letter.

25. Plaintiff alleges that the fraudulent concealment of the tampered promotional list,

the criminal investigation complaint, and the use of wiretaps and pen registers during

that investigation were violations of plaintiff's first amendment (right to petition to

government), fourth amendment (right to privacy and unlawful searches), fifth

amendment (right against self-incrimination), sixth amendment (right to confront your

accuser and right to speedy trial), and fourteen amendment (right to procedural due

process) constitutional rights.

26. Plaintiff alleges that defendants had actual or constructive knowledge of the

following due process laws (**Garrity v. New New Jersey,  Harris v. State, Brady v.**

**Maryland, Franks v. Delaware, the Law Enforcement Police Bill of Rights**, Open Records Decision No. (1978), government code: special right of access of an employee, Title III 18 USC 2510-2521 and 18 USC 3122-3123. However, defendants ignored the law.

27. Defendants placed the criminal investigation complaint in plaintiff's internal affairs file without notification until 24 years later as a negative employment reference. Plaintiff **claims post-employment retaliation** under Title VII 1964 and retaliation under 42 USC 1981. According to Title VII 1964, we hold that the term "employees," as used in §704(a) of Title VII, includes former employees within the **§704(a)'s coverage**. Robinson v. Shell Oil Co. (95-1376), 519 U.S. 337 (1997). Plaintiff pleads to the Court some acts of retaliation occurred over an extended period of time and included other types of contracts which plaintiff will prove by a preponderance of evidence.

28. Plaintiff pleads to the Court that Defendants engaged in continuous wrong doing. Therefore, ask that the statute of limitation be tolled. Under this doctrine, "where there is a series of continuing wrongs," the statute of limitations will be tolled to the last date on which a wrongful act is committed. *Henry v. Bank of Am.*, 147 A.D.3d 599, 601 (1st Dept. 2017). If the **continuing wrong doctrine** applies, it "will save all claims for recovery of damages but only to the extent of wrongs committed within the applicable statute of limitations." *Id*. The application of the continuing wrong doctrine must be predicated on continuing unlawful acts. ***Defendants have deliberately omitted the dates of the criminal investigation.***

29. Plaintiff alleges that defendants (City of Houston) established a **labor contract** with police and fire fighters that includes certain disciplinary terms and conditions where confidentiality exist. Therefore, defendants had a duty to disclose the criminal investigation to him. Plaintiff believes that defendants had (1) a duty to speak on the subject, in which

case he/she must speak truthfully and completely about the matter (*see Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 351 (S.D.N.Y. 2013)); (2) there is a fiduciary relationship between the plaintiff and defendant (*see Balanced Return Fund Ltd. v. Royal Bank of Canada*, 138 A.D.3d 542, 542 (1st Dept. 2016)); or (3) the defendant possesses "special facts" about the matter not known by the plaintiff (*Pramer S.C.A. v. Abaplus Int'l Corp.*, 76 A.D.3d 89, 99 (1st Dept. 2010).

# I. FACTS SUPPORTING FRAUD AND CIVIL RIGHTS VIOLATIONS

Plaintiffs hereby incorporate paragraphs 1 through 11  as if fully set forth herein.

30. Plaintiff states that the content of the letter reads as follows:

31. The May 31, 2018 letter was received from Attorney Kristie Lewis, Chief Art Acevedo, and the City of Houston under the designated HPD: ORU No. 18-04440.

32. The May 31, 2018 letter was addressed Attorney General Ken Paxton and carbon copied to me.

33. The correspondent stated that the internal affairs division investigated a charge of misconduct; however, the allegations of misconduct were not sustained and there was **no discipline**.

34. The correspondent further stated that *the internal affairs division **may only release** information in those investigatory files or documents relating to a charge of misconduct, **to another law enforcement agency**,* to the office of a district or United States attorney, or in accordance with Subsection (c ). (admission/misrepresentation)

35. The correspondent further stated that the internal affairs division conducted a *wiretap investigation in compliance with Article 18.20 of the Texas Code of Criminal Procedure that pertains to the detection, interception, and use of wire, oral, or electronic* communications. *The sealing of orders.* Specifically, section 11 of article 18.20 provides in relevant portion that " (a) judge shall seal each application made and order granted under this article…(and) an application or order may be disclosed only on *showing of good cause before a judge of competent jurisdiction and **may not be destroyed until at least 10 years after the date** it is*

*sealed."(misrepresentation)*.

36. The correspondent further stated *that the responsive information submitted as Exhibit 2 contains **interception applications filed in various District Courts** of Harris County by Assistant District Attorneys for Harris County (misrepresentation)*.

37. The correspondent further stated that *each application involves Houston Police Department **officers** assigned as investigators of each respective investigation*.

38. The correspondent further stated that *all applications and orders have been **sealed by their respective judge** and each application and order is so designed on its cover (misrepresentation)*.

39. The correspondent further stated that the *request made was not with **a showing of good cause** (misrepresentation)*.

40. The correspondent further stated that the ***public disclosure of the sealed applications and orders has not been presented to a judge** of competent jurisdiction (misrepresentation)*.

41. The correspondent further stated that *since the public disclosure of the sealed applications and orders has not been presented to a judge of competent jurisdiction; as such, the **Department believes that the requested orders must be withheld** in accordance with section 552.101 the Government Code in conjunction with 18 U.S. C. Section 3123(d).* (misrepresentation).

42. The correspondent further stated that under criminal code section 11 article 18.20 the *judge shall seal each application made and order granted* under this article. (misrepresentation).

43. The correspondent further stated that Article 18.21 of the Code of Criminal Procedure permits *a court, on application by a prosecutor, to issue an order authorizing the installation and use of a pen register*, ESN reader, trap and trace device, or similar equipment (misrepresentation).

44. The correspondent further stated that Article 18.21 allows the court to seal an application and order granted under this article (misrepresentation).

45. The correspondent further stated that "in this instance, the submitted documents, *Exhibit 3 consist of court orders granted under articles 18.20 and 18.21* and the corresponding **applications** for the orders (misrepresentations).

46. The correspondent further stated that *the Department believes it must withhold the responsive information contained in Exhibit 3 pursuant to the section 552.107 of the Government Code in conjunction with articles of 18.20 and 18.21* of the Code of Criminal Procedure. (misrepresentation).

47. The correspondent *failed to list any criminal offenses* (fraudulent concealment).

48. The correspondent *failed to list the dates of any offenses* (fraudulent concealment).

49. The correspondent *failed to list the dates as to when the criminal investigations were* concluded (fraudulent concealment).

50. The correspondent *failed to **notify me** when the internal affairs criminal investigation were concluded* (fraudulent concealment).

51. The correspondent *failed to list the dates that the sworn wiretap affidavit(s) was signed*

(fraudulent concealment).

52. The correspondent *failed to list the dates that the pen register sworn affidavit application(s) was signed* (fraudulent concealment).

53. The correspondent *failed to list where the wiretap sworn affidavit(s) was stored* as a matter of record (fraudulent concealment).

54. The correspondent *failed to list where the pen register sworn affidavit(s) was stored* as a matter of record (fraudulent concealment).

55. The correspondent *failed to list the names of any internal affairs investigators* (fraudulent concealment).

56. The correspondent *failed to list any prosecutors* (fraudulent concealment).

57. The correspondent *failed to list any magistrates or judges* (fraudulent concealment).

58. The correspondent *failed to list any complainants* (fraudulent concealment).

59. The correspondent *failed to list any courts* (fraudulent concealment).

60. The correspondent *failed to list the courts where the exhibits were sealed* (fraudulent concealment).

61. The correspondent *failed to list any court clerks* (fraudulent concealment).

62. The correspondent *failed to list any court orders* (fraudulent concealment).

63. The correspondent further was written on City of Houston letter head, listing Mayor Sylvester Turner, Members of the Houston City Council, Police Chief Art Acevedo, signed by HPD Staff Attorney, Kristie L. Lewis, **addressed to Ken Paxton**, Texas Attorney General, P. O. Box 12548, Austin, Texas 78711-2548 and presented as an official government record (fraudulent concealment).

64. The correspondent further stated that the May 31, 2018 was forwarded to Dr. Hall without any exhibits.

65. Due to the ambiguous and vague nature of the  May 31, 2018 letter, Plaintiff sought clarification by contacting attorneys to explain it. Plaintiff believes that the internal affairs division used illegal pen registers to influence his efforts to hire an attorney.

66. Plaintiff, on August 8, 2018, forwarded a reconsideration ruling letter to Assistant Attorney General, Patrick P. Mehaffy, Open Records Division, Post Office Box 15548, Austin, Texas 78711-2548, 512-463-2100. No response.

67. Plaintiff believed that the May 31, 2018 letter consist of many misrepresentations and the fraudulent concealment of facts and circumstances surrounding the criminal investigation was designed to suppress information material to connecting a cause of action and determining injury, harm, and damages.

# II. CONSPIRACY TO ENGAGE IN FRAUDULENT CONCEALMENT AND THE THEORY OF CONTINUING ACTS.

Plaintiffs hereby incorporate paragraphs 1 through 16  as if fully set forth herein.

75. Plantiff pleads both the theory of fraudulent concealment to toll the statute of limitations and the theory of continuing acts.   Defendants have conspired to fraudulently conceal specific facts and circumstances regarding the criminal investigations that were placed in his internal affairs file without him being notified until May 31, 2018 . Defendants sought to conceal the criminal investigation because they knew that the criminal investigation used illegal wire taps, pen registers, computer hacking, and sting ray devices. Plaintiff alleges that the criminal investigation was part of  a conspiracy to have him disqualified from an affirmative action promotion and to replace him with a less qualified candidate who was coaching his ex-wife to make the complaint.

76. Fraudulent concealment is an equitable doctrine which tolls the statute of limitations where a defendant conceals his unlawful conduct either by (1) failing to disclose his wrongful conduct when there is a duty to disclose, or (2) by lying about their conduct. Timberlake v. A.H. Robins Co., 727 F.2d 1363, 1366 (5th Cir. 1984) (quoting Nichols v. Smith, 507 S.W.2d 518, 519 (Tex. 1974)); Borderlon v. Peck, 661 S.W.2d 907, 908 (Tex. 1983); Arabian Shield Development Co. v. Hunt Oil Co., 808 S.W.2d 577, 584 (Tex. App. – Dallas Division 1991). Defendants fraudulently concealed tampering with the promotional list facilitated by a Federal Judge. In essence, defendants ignored the rule of law.

77. Plaintiff pleads, that (1) defendants had actual knowledge of the facts giving rise to plaintiff's cause of action, (2) defendants concealed their unlawful conduct, and (3) plaintiff failed, despite due diligence on his part, to discover the facts giving rise to his cause of action. Tex. v. Allen Constr. Co., 851 F.2d 1526, 1528 (5th Cir. 1988); Timberlake, 727 F.2d at 1366. Thus, **when a defendant controls the facts giving rise** to a plaintiff's cause of action "such that a reasonable person could not obtain the information even with a diligent investigation, a cause of action accrues, but the statute of limitations is tolled." Piotrowski v. City of Houston, 51 F.3d 512, 517 (5th Cir. 1995).

78. Plaintiff alleges that despite his efforts to exercise reasonable diligence that defendants engaged in multiple conspiracies to **control the facts** that would support his causes for action. Plaintiff alleges that defendants' May 31, 2018 letter fraudulently **concealed the dates of the criminal offense**(s), the name of complaint, the type of offense(s), the dates of wiretap applications, the dates of pen register applications, the dates of sting ray applications, the date and name of Magistrate sealed the evidence, the date that the criminal complaint was initiated and completed, the dates that the wiretap, pen register, and sting ray devices were installed, the date plaintiff was notified of the criminal investigation, the dates and name of the prosecutor who approved the wiretap, pen register, and sting ray devices, the names of internal affairs investigators who investigated the criminal complaint, and the cost invoice from phone companies for servicing wiretaps, pen registers, and sting ray devices.

79. As mentioned, at the time of this incident, D**efendants also failed to notify the EEOC** investigator of the criminal investigation using wiretaps, pen registers, and sting ray devices. pen registers. Chief Bradford and Chief Dotson claimed that plaintiff was paranoid when he believed his phone was being tapped. Under 18 USC 1001, it is a crime to lie to a federal investigator **(EEOC investigator1) under 18 USC 1001, which reads, w**hoever, in any matter within the jurisdiction of the executive, legislative, or judicial of the Government of

the United States, knowingly and willfully, (1)Falsifies, conceals, or cover ups by any trick,
scheme, or device a material fact; (2) Makes any materially false, fictitious, or fraudulent
statement or representation; or makes or uses any false writing or document knowing the
same to contain any materially false, fictitious, or fraudulent statement or entry; shall be
fined under this title, imprisoned not more than 5 years. Plaintiff alleges that he made a
timing EEOC complaint and Defendants committed the federal crime of concealing material
facts from the EEOC investigator's investigation.

80. **In exercising due diligence**, Plaintiff filed a public corruption police complaint made to
District Attorney's Office on August 9, 2019 based on what he perceived to be false
statements in the May 31, 2018 letter. No investigation to my knowledge.

81. **In exercising due diligence**, Plaintiff filed public corruption complaint with the Houston
FBI Office in August 2019. No investigation conducted to my knowledge.

82. **In exercising due diligence,** Plaintiff filed police report made with Harris County Sheriff
Department on March 14, 2020 against Chief Acevedo for Tampering with Government
Record under Harris County case number 2003-05285 based on false statements in the May
31, 2018 letter. No investigation conducted to my knowledge.

83. **In exercising due diligence,** Plaintiff filed police report made with Houston Police
Internal Affairs Division on May 26, 2020 against Chief Acevedo for Tampering with
Government Record based on false statements in May 31, 2018 letter under HPD case
number 56174-2020.  No investigation conducted to my knowledge.

84. **In exercising due diligence**, Plaintiff requested another open record request for the wiretap
and pen register applications, offense name, probable cause affidavit, name of complainant,
court orders, names of Judge, Prosecutor, Clerk, sealed evidence, investigators, and court

where evidence sealed **on 7-28-20**. No response. Plaintiff checked the regular mail and my email and there was no response as of **August 12, 2020 or any time thereafter.**

85. **In exercise reasonable due diligence**, plaintiff contacted about fifty attorneys to assist him between 2018 and 2020. Plaintiff can provide the names on demand. Plaintiff stated that the responses from these attorneys included: some were not taking on new clients, some didn't want to enter into a contingency agreement, some said that they weren't familiar with wiretap, pen register, sting ray devices, police government code laws, and some may have been contacted by the internal affairs division as interference of a legal contract.

86. **Despite exercising due diligence**, plaintiff was not able to obtain the facts and circumstances of the criminal investigations alleged in the May 31, 2018 letter due to defendant's fraudulent concealment and the police code of silence. It was only after receiving a truthful statement by a police official on **August 15, 2020** (who asked for anonymity) that plaintiff became aware that defendants were being untruthful and that plaintiff should have been notified at the conclusion of the criminal investigation.

87. Plaintiff alleges Defendants concealment of the date of the criminal investigation(s) Interfered with his cause of action in determining the connection to the date defendants' begin to use the criminal investigation as a negative employment reference as retaliation against plaintiff.

88. Plaintiff pleads to the Court not to allow defendants to avail themselves of the protection of a limitations statute when by their own fraud prevented the plaintiff from **seeking redress** within the period of limitations. **To reward a wrongdoer** for his own fraudulent contrivance would make the statute a means of **encouraging** rather than preventing **fraud.** Id. "The gist of fraudulent concealment is the defendant's active suppression of the truth or failure to disclose when the defendant is under **a**

**duty to disclose**." Mitchell, 958 S.W.2d at 439. It "requires actual knowledge by the defendant that a wrong has occurred and a fixed purpose to conceal the facts necessary for the plaintiff to know that it has a cause of action." Vial v. Gas Solutions, Ltd., 187 S.W.3d 220, 230 (Tex. App. 2006, no pet.)

89. Plaintiff ask that the statute of limitations be tolled for any two year statute of limitation cause of action due to defendants conspiracy to fraudulently conceal facts and circumstances that would support his injury and his cause of action and defendants' code of silence.

## III.  CONSPIRACY TO VIOLATE 42 U.S.C. & 1983:

## Violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendments and The Police Code of Silence

Plaintiffs hereby incorporate paragraphs 1 through 20  as if fully set forth herein.

42  .S.C. & 1983 provides that:

90. Every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subject any citizen or the United States or other person within the jurisdiction thereof to the **deprivation of any rights,** privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity or other appropriate proceedings for redress.

91. While defendants were acting under the color of state and federal laws in their capacity as Mayor, City Attorney, Assistant City Attorney, Police Attorney, Chief of Police, Houston Police Officers, Internal Affairs Officers, and complainant, including their acts and or omissions, **engaged** in various conspiracies while in the scope of their official duties or employment to deprived plaintiff of his constitutional rights for twenty four years by failing to notify plaintiff of the criminal investigation using wiretaps taps, pen registers, and sting ray devices.

92. Defendants stated that the criminal investigation was conducted according to the Texas Code of Criminal Procedures Article 18.20 and Article 18.21.

93. The Texas Code of Criminal Procedures Article 18.20 and Article 18.21 states:
**Article 18.01 of the Texas Code of Criminal Procedure reads:** (a)  A "search warrant" is a **written order**, issued by a magistrate and directed to a peace officer, commanding him to

search for any property or thing and to seize the same and bring it before such magistrate.

94. Under exception, Art. 18.011.  Sealing of Affidavit.  **18.01(b).**  The judge may

order the affidavit sealed if the attorney establishes a compelling state interest in that:

(1) **public disclosure of the affidavit would jeopardize the safety of a victim, witness,**

**or confidential informant or cause the destruction of evidence**; or

(2) the affidavit contains information obtained from **a court-ordered wiretap that has not**

**expired** at the time the attorney representing the state requests the sealing of the affidavit.

(b)  An order sealing an affidavit under this section **expires on the 31st day** after the date

on which the search warrant for which the affidavit was presented is executed.

95. On the expiration of an order issued under Subsection (b) and any extension, the

**affidavit must be unsealed**.

96. An order issued under this section may not: (1) **prohibit the disclosure of information**

**relating to the contents of a search warrant, the return of a search warrant, or the**

**inventory of property taken   pursuant to a search warrant**; or  (2) **affect the right of a**

**defendant to discover the contents of an affidavit**.

97. Under Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)

Plaintiff  has a right to request an evidentiary hearing before the judge to show proof

that the affidavit does not contain **false statements.** ;

**98.** Under Harris v. State, 227 S.W. 3d. 83, 85 (Texas Criminal Wiretap Statute,

Section 6.02),  Plaintiff has a right to request an evidentiary hearing before the judge.

**99.** Under Garrity v. State of New Jersey (385 US 493 ) and Miranda Warning,

plaintiff has the fifth amendment right to be free from self-incrimination.

**100.Under Title III of the Wiretap statute**, plaintiff also had a constitutional right to be

notified of at the conclusion of the wiretap investigation.

**101.** Under Brady v. Maryland, Plaintiff had a right to present exculpatory evidence in

the criminal investigation (Due Process-14[th] amendment).

**102.** Under the Texas Rules of Evidence, plaintiff had a right to question the credibility of

any complainant, witness, or defendant for impeachment purposes. Defendants

violated plaintiff's sixth amendment right.

**103.** During a criminal investigation, plaintiff has a right to the written complaint and

evidence used against him: 1. copies of offense  report(s); 2. designated documents or

other papers of the defendant; 3. written statement of the defendant and any other

witness; 4. recorded statement of the defendant and any other witness; 5. designated

books, accounts, or letters; 6. **photographs**; and, 7. objects or other tangible

things not otherwise privileged that constitute or contain evidence material to any matter

involved in the action and that are in the possession, custody, or control of the State or

any person under contract with the State. Law Enforcement Police Bill of Rights (1995).

104. Plaintiff has a right to contact the *Texas Department of Criminal Justice* to verify that the Defendants filed pen register and wiretap applications with them as required by Texas law.

105. Plaintiff has a *right to suppress evidence* in a criminal proceeding gained through the use of any illegal wiretap, pen register, and or audio recording if a peace officer does not apply for or applies for but does not obtain authorization for a wiretap or pen register/trap/trace device.

106. Under the Law Enforcement Bill of Rights (1995), Plaintiff had a clearly established Right to be notified at the conclusion of the criminal investigation conducted by the internal affairs division.

107. Under the fourth amendment, plaintiff had a right of privacy and expectation of privacy in his own home free from defendants conspiracy to intrude on his privacy as part of a conspiracy to frame him.

108. Plaintiff claims that defendants failure to notify him of the criminal investigation complaint and disposition was a violation of his constitutional rights

# IV. CONSPIRACY TO VIOLATE 42 U.S.C. & 1983
## Civil Rights and the Code of Silence

Plaintiffs hereby incorporate paragraphs 1 through 24  as if fully set forth herein.

109. Pursuant to 42 U.S.C. § 1983. Defendants engaged in a (1) practice or custom that, although not officially authorized is widespread and well settled; (2) an official policy adopted and promulgated by its officers; or (3) an official with final policy-making authority; therefore, making the municipality liable.

110. The City can be subject to Section 1983 liability under Monell, "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." Thomas v. Cook Cty. Sheriff's Dep't, 604 F.3d 293, 303 (7th Cir. 2009) (citing Monell, 436 U.S. at 690, 98 S. Ct. at 2036–36). "The critical question under Monell . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it).

111. Defendants engaged in the unconstitutional act of failing to notify Plaintiff of a criminal complaint which they placed in his internal affairs file and used as a negative employment  reference. Defendants also engaged in the unlawful acts of conducting illegal electronic surveillance on plaintiff by using wiretaps, pen registers, and sting rays. Under the code of silence, two things occur (1) defendants can violate any law without consequences and (2) officers who report misconduct are retaliated against.

112. Plaintiff claims that the police code of silence is used to retaliate against officers who report the police misconduct of their fellow officers.

113. Plaintiff claims that defendants endorsed a code of silence by also committing and condoning the misconduct of **tampering with a government record (the manipulation of promotional list)** as

part of a conspiracy to disqualify from a promotion. Plaintiff did not received a copy of the manipulated government record on **October 26, 2019.**

114. Plaintiff cites previous law suits involving the Houston Police code of silence to support the claim that the City of Houston is well aware of the problem, it has with the police code of silence. Plaintiff documents two federal lawsuits citing the Houston Police Department operates by a police code of silence: Sharp v. City of Houston (1994) and Zamora v. City of Houston (2016).

115. In the case of Zavala v. City of Houston, Officer Zavala's attorney states, "Zavala is really suffering retaliation, and is being punished for breaking the department's "blue code of silence," for daring to criticize HPD from within, writing a letter accusing IAD of racism and of coercion of a witness. Fred Keys served 14 years in the HPD before becoming a lawyer; according to Mr. Zavala's attorney, Mr. Keys stated that all officers know that breaking the code is dangerous.

116. *When an officer comes forward with a whistle blower type thing, says Keys, "no matter what it may be, the department uses every official means within its power to make that guy's life miserable.* As a result, officers are very reluctant to come forward. Every body knows that if you buck the department, they're going to get you."

121. Plaintiff shares excerpt from  Zavala v. City of Houston No. 00-20859:

The record evidence indicates that, beginning on July 23, 1996-only **one week** after Officer Zavala reported IAD's illegal activity in the Puente investigation to HPD's Chief of Police – (Sam Nuchia) and continuing for almost eight weeks thereafter, IAD used Mr. Orzabal in an elaborate "sting" operation designed to **entrap Officer Zavala into criminal activity.** As part of this operation, IAD devised and planned bribery, drug, and money laundering

"scenarios" for Mr. Orzabal to proposition Officer Zavala; directed and coached Mr. Orzabal in implementing these "scenarios"; procured, supplied, and **outfitted Mr. Orzabal with recording devices to record conversations with Officer Zavala; and conducted extensive electronic surveillance on Officer Zavala.**[40]

122.**In Zamora v. City of Houston, No. 14-20125 (5th Cir. Aug. 19, 2015)**:

123(a).Zamora, a police officer, alleged that he was subjected to unlawful retaliation under Title VII because of his father's involvement in a civil-rights lawsuit. Zamora was removed from an assignment with the Department's prestigious Crime Reduction Unit ('CRU').

124.Zamora's father (Manuel) reported several defense deposition witnesses to the city police department's Internal Affairs for allegedly **lying under oath**. But Internal Affairs turned the investigation back around on Zamora, and he was himself suspended:

125.As part of Internal Affairs' investigation into Manuel's complaint, Zamora was questioned on the specifics of his allegations of discrimination, harassment, and retaliation.

126.After  interviewing his CRU supervisors and nearly two dozen other officers, the Internal Affairs Division determined that **Zamora**, not his CRU supervisors, *had violated the Department's policies by being untruthful in his responses during the investigation.*

127. *That determination was largely based on statements made by Zamora's CRU supervisors that harshly attacked his credibility and baldly contradicted his factual assertions.*

128. A departmental disciplinary committee recommended that Zamora be suspended for ten days, and the Chief of Police approved the suspension."

129. Plaintiff cites this case as an example of a bias and tainted investigation based a department wide code of silence that is accompanied by retaliation for reporting police misconduct.

130. Attorney Kim Ogg, stated, "*A government willing to violate its officers' own civil rights is likely to violate the rights of its own citizens, and we have to stand against that*".

131. **In Sharp v. City of Houston,  Judge Jerry Smith stated that HPD has a policy, custom, or practice of enforcing the code of silence** also during the (Sharp v City of Houston) *Police Chief Nuchia warned Sharp that she would be subjected to retaliation and told her it was her destiny.*

132. Sergeant Michael Cox claims that **HPD officers manipulate IAD investigations** which resulted in his termination because he testified on the behalf of a female officer who filed an EEOC complaint.

133. Officer Beth Kreuzer a female officer who won a $600,000 verdict for **sexual harassment** against the city says the command staff have interfered with investigations into alleged officer misconduct ignoring investigative findings.

134. You've got assistant chiefs that **abuse their powers** and influence the outcome of these investigations, and **that is corrupt to me**, said Beth Kreuzer.

135. When confronted with the Chronicles' researched the internal affairs division in 2012, HPD Executive Assistant Chief Tim Oettmeier, stated, "**I did not know that we had 250 some odd officers that have been cited for criminal activity**".

136. Plaintiff claims that the retaliation that he suffered was intentional and due to his race. Below a discipline synopsis researched by the Houston Chronicle in 2011. Exhibit: **Here Incorporated is exhibit:**

HPD Open Record Audit of IAD by Houston Chronicle (2011) Reflects Police Misconduct and Criminal Behavior:

On March 28, 2011, the Houston Chronicle conducted an audit of the Houston Police internal affairs unit: To find out how HPD disciplines its 5,400 officers 11 News examined the history of every cop on the force. More than 13, 000 sustained internal affairs complaints. The worst violators were 254 officers who HPD determined and defined as having **committed criminal activity**. Officers Selvyn Ellis cited for 47 complaints 27 sustained, Roderick Caldwell, cited for 44 complaints, 16 sustained, Robert Kessler cited for 32 complaints, 18 sustained, Daphine Stevensen cited for 31 complaints, 18 sustained, Jaime Escalante, had 43 sustained complaints, Willian Linsey cited for 32 complaints, 27 sustained.

Individual officer synopsis:

Eldon Harris received a 20 day suspension for drinking bourbon while on duty in Memorial Park. After being discipline, engaged in same misconduct again. He was later promoted to Lieutenant.

Officer Lilia Gonzales was a multiple violator. She was arrested for an off duty accident having a .20 blood alcohol level. Before she could serve a 15 day suspension, she committed a similar infraction and received a 20 day suspension.

Officer Timothy Frantz assaulted his live in girl friend and received a four day suspension. Three months later, he did it again and received a 30 day suspension.

Officer Mario Gomez was double dipping or falsifying his work card(s). He received a 35 day suspension.

Officer Karavantos went through the county toll booths 1,600 times without paying racking up more than $16,000 in fines. He received a 15 day suspension.

Sergeant Hampton was suspended from the police force multiple times. He received a suspension for assaulting another officer by placing a gun to the officers head. He also had a female officer complaint on him for attempted rape. The Adminstrative Disciplinary Committee recommended firing but Chief Hurtt gave him a 15 day suspension. **Sergeant Hampton went on to shoot and kill an unarmed citizen on December 25, 2011. Sgt. Hampton is still a Houston Police Officer.**

Sergeant C.E. Simmons received a seven day suspension for a **sexual harassment** complaint.

Sergeant Michael Cox claims that HPD officers manipulate IAD investigations which resulted in his termination because he testified on the behalf of a female officer who filed an EEOC complaint.

Officer Beth Kreuzer a female officer who won a $600,000 verdict for **sexual harassment** against the city says the command staff have interfered with investigations into alleged officer misconduct ignoring investigative findings.

"You've got assistant chiefs that abuse their powers and influence the outcome of these investigations, and that is corrupt to me", said Beth Kreuzer.

In the case of Zavala v. City of Houston, Officer Zavala's attorney states, "Zavala is really suffering retaliation, and is being punished for breaking the department's "blue code of silence," for daring to criticize HPD from within, writing a letter accusing IAD of racism and of coercion of a witness. Fred Keys served 14 years in the HPD before becoming a lawyer; according to Mr. Zavala's attorney, Mr. Keys stated that all officers know that breaking the code is dangerous. "When an officer comes forward with a whistle blower type thing, says Keys, "no matter what it may be, the department uses every official means within its power to make that guy's life miserable. As a result, officers are very reluctant to come forward. Every body knows that if you buck the department, they're going to get you."

Officer Jose Coronado who was drunk when he shot two unarmed men, killing one of them September 19, 2011, was not disciplined for the shooting and received a 30 day suspension.

In September 2013, four white officers were suspended for milking the City out of 1 million in overtime pay since 2008. Chief McClelland issued them suspensions ranging from 20-45 days and stated he wanted to salvage their careers.

Captain Dewayne Ready received a 90 day suspension (2008)for operating his security business out of the Public Affairs Office while on duty, which is called "double dipping" using his city computer, police records, and using thirty on duty police officers to run his business.

In the case of Officer Swilley, she was one of the good guys but Chief Michael Dirden lied in his statement and she was terminated even when the internal affairs finding shown that the complaint was not sustained. Despite the evidence, Officer Swilley termination was never overturned (2007).

Judge Jerry Smith stated that HPD has a policy, custom, or practice of enforcing the code of silence also during the (Sharp v City of Houston) Police Chief Nuchia warned Sharp that she would be subjected to retaliation and told her it was her destiny (1995).

137. Neal Trautman, Director, The National Institute of Ethics, who is an expert on the police **code of silence**, identifies the same characteristic in his research. His findings include that 73% percent of individuals who pressure officers to keep quiet about misconduct were leaders. Whistle blowers are generally not supported by the police administration leaders. The code of silence among administrators although better camouflaged and less well known is more destructive than when non-ranking personnel do the same thing. The Code of Silence typically conceals serious law enforcement misconduct for years before the corruption is revealed. The code of usually occurs within cultures created by the role Modelling of leaders. The code of silence creates a "us" versus "them" mentality. The widespread indifference to the integrity of the law by leaders creates the breeding ground for the custom of operationalizing of the code of silence. The code of silence fosters a lack of accountability and the rationalization by participants that retaliation is ok because he's not one of us.

138. Below is a copy of the letter that I forwarded to Chief Nuchia regarding the conspiracy to disqualify me from a promotion. **Here incorporated as exhibit**:

# BIGHAM, LUTTRELL & WILLIAMS, P.C.

### ATTORNEYS AT LAW

HOUSTON, TEXAS 77002-3005
TEXAS COMMERCE TOWER
600 TRAVIS, SUITE 3700
TELEPHONE (713) 236-1652
TELECOPIER (713) 236-1734

PASADENA, TEXAS 77502-4651
2707 SHAVER

TELEPHONE (713) 943-3830
TELECOPIER (713) 943-7107

August 19, 1993

Chief Sam Nuchia
Chief of Police
Houston Police Department
61 Riesner
Houston, Texas 77002

Dear Chief Nuchia:

I have procured the assistance of the law firm of Bigham, Luttrell & Williams to write this letter is in response to the disparate treatment, and harassment that I have been subjected to for approximately the last year. I feel that it is necessary that you are informed of situations which are taking place presently regarding my employment with the department. I also feel that it is incumbent upon me to bring to light the overt attempts of the commanding officers and upper ranks which direct various departments within the force to castigate, degrade, and dehumanize me. On their face, these actions appear patently discriminatory. I have been subjected to this harassment solely because I am an African-American officer who has shattered the preconceived, stereotypical mold that many chose to put African-American officers into.

It angers and frustrates me that after twelve (12) years of dedicated service to this department that I could become the focal point of an internal affair's investigation which is totally unwarranted and is malicious in nature. During my tenure with the Houston Police Department, I have made total a commitment to myself, this department, and most importantly, to this city. I have always projected an image of a professional police officer. I have been involved in numerous civic and community activities and programs. I have received commendations and awards for my service to this department and most importantly I have attempted to reach out to the citizens of this City to demonstrate to them that the Houston Police Department is a department that is familiar with and responsive to their needs.

During my years on the force, the department has gone through many changes and suffered through many critical stages of development. From this I learned that it is each officer's solemn duty to insure that justice is served. This may be what has ultimately caused the difficulty that I am suffering through now. Because I understand that justice and what is right must always be upheld, regardless of where or what situation you find yourself in, I have sometimes taken a stand against what I considered wrong in

Chief Sam Nuchia
August 19, 1993
Page 2

the department.  Leave it to say that my positions have not always
fell in favor with my fellow officers.  In fact, because of my
bringing to light various indiscretions within the department, I
have caused some fellow officers to be reprimanded as well as
separated from service.  I feel that it is unfortunate that those
events happened but my conscience is clear because I know what I
did was right.        Since  the  last  of  these  internal  policing
situations concluded, I have felt that I have been targeted for
retaliation.  The ultimate form or retaliation has started.  My
professional reputation, my status with the department, and my
character are being assailed.

     It is my understanding that internal affairs is conducting an
investigation into my activities.  This investigation encompasses
my employment activities as well as personal activities.  The
history behind this situation begins in November 1992.  During that
time I was involved in a dispute regarding the maintenance of a
property that I own.  This property was damaged by a serviceman as
a result of a dispute we had regarding payment of services.  I
filed a report on this vandalism and then when about handling the
matter through the civil court system.  Since that time it has come
to light to my fellow officers, and superiors that I own various
parcels of property in this city.  This does not meet the approval
of several of those officers and supervisors.  It has been brought
to my attention that I am now the victim of vicious rumor and
innuendo regarding my acquisitions of these properties.  It is a
tragic state of affairs and reprehensible that many of the Anglo
officers and supervisors in this department have the opinion that
any African-American officer who has made the effort to work hard,
save wisely, and be smart, cannot be legitimate in his endeavors.

     Chief, I want you to understand I am not speaking in
conjecture. I am speaking from experience.  I have seen this type
of thing happen before.   Whenever there is an Africa-American
officer who has acquired a level of material comfort in his life,
that officer is invariably thought of as one who has acquired his
creature comforts illicitly and illegally by the Anglo officers in
this department.  I am not one to tolerate such opinions.

     I am angry that my character has come into question.  I will
do anything to assist you and the department to clear my name.  I
do not know what type of investigation is being undertaken
regarding me nor do I know what it involves.  What I do no know is
that I am willing and will formally offer all my assistance in
clearing my name.   The specter of being the target of an
unwarranted investigation outrages me.  I have broken no laws nor
committed any crimes in any endeavor prior to or during my tenure
with the Houston Police Department.  I will not tolerate envious
and sophomoric officers being allowed to so thoroughly discredit me
that the department feels that it is necessary to look into my

Chief Sam Nuchia
August 19, 1993
Page 3

activities. My activities have always been above board and it
distresses me that the sole reason for what is taking place is that
I am African-American.

I have always considered myself an intelligent man. Not only
do I possess a formal education, which includes graduate degrees in
higher learning, but I also possess a knowledge and understanding
of the common man. Often I find that this knowledge is more
important in my daily work than any degree or diploma that I might
have. It is this knowledge which allows me the luxury of knowing
that my lifestyle and sensibilities are threats to the Anglo
officers in this department. I have been cautious and very astute
in my finances and this has allowed me to better myself and my
family. Those officers who have differing priorities, be it a
suburban home, a power boat, a deer lease, or any other such
pedantic activity or station, should not be allowed to influence
this department into concluding that my frugality is anything else
but frugality.

If my name and my reputation are at stake I demand that they
be exonerated. I am so committed to this demand that I will offer
my total services to that end. It is defamatory for these officers
as well as this department to attempt to ostracize me in such a
fashion. I have always been hesitant to conclude that one's race
did make a difference in this department, but if this course of
action continues, I will be forced to that conclusion.

I expect open lines of communication regarding these issues.
I want these matters resolved and look forward to speaking with you
at length regarding any and everything that involves me or my
activities.

Very truly yours,

*J. Earl Hall*

Sgt. John Hall

HL/js
DKM\HALLPOA.2

cc:  Assistant Chief J.L. Breshears
     Internal Affairs Division
     Houston Police Department
     61 Riesner
     Houston, Texas 77002

     Assistant Chief J. R. Jones
     Eastside Command Division
     Houston Police Department

# V. CONSPIRACY TO COMMIT FRAUD

Plaintiffs hereby incorporate paragraphs 1 through 36 as if fully set forth herein.

139. Prior to the May 31, 2018 letter, plaintiff had never been notified of a criminal investigation.

140. Defendants engaged in fraudulent concealment of material facts during the EEOC investigation that plaintiff filed in 1995.

141. Defendants continued their fraudulent concealment of material facts after I was granted the promotion, before I retired in 2004, and after I retired.

142. The elements of fraud in Texas are (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury. Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter, 607 F.3d 1029, 1032-33 (5th Cir. 2010) (citing Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001)).

143. Defendants made representations through written request for records concerning complaints by ex-wife that non-existed. At the time various request were made, defendants knew that they were not being truthful and that they were misleading plaintiff. Defendants made the false representations with the hope that plaintiff would stop seeking information as to why he was continuously being retaliated against. Plaintiff relied on the false information because he didn't anticipate that the conspiracy involved final policy and decision makers.

And as a result of relying on the false information, plaintiff suffered constitutional right violations, injury, harm, and damages.

144. Plaintiff did not rest on his rights. Plaintiff made open records request for complaints made by his ex-wife in 1997. Below is a letter from the open record division ordering Chief Bradford to release plaintiff's files because the police department failed to seek an opinion after numerous request to them by plaintiff. Despite the Attorney General ordering the release of all of plaintiff's internal affairs files, Chief Bradford still engaged in fraudulent concealment.

Here incorporated as Exhibits:



## Office of the Attorney General
### State of Texas

DAN MORALES
ATTORNEY GENERAL

September 19, 1997

Mr. Clarence Bradford
Chief of Police
Houston Police Department
61 Riesner
Houston, Texas    2

Dear Chief Bradford:

This letter is to serve as notice that this office has received the attached complaint from Mr. J. Earl Hall regarding a request for information made to the Houston Police Department pursuant to the Texas Open Records Act ("the act"), chapter 552 of the Texas Government Code. This complaint has been assigned ID# 110093.

An attorney general's opinion must be sought whenever the applicability of a particular exception to particular information has not already been determined. Open Records Decision No. 435 (1986). Where only the *standard* to be applied has been addressed, the applicability of the standard to particular information must be determined by the attorney general. *Id., cf. Houston Chronicle Publ'g Co. v. Mattox* 2d 695, 698 (Tex. 1989) Records Act does not require previous determination specific piece of information previously determined to be public; *attorney general* has discretion to determine when previous determination has been made regard category of information to which request belongs. This office has consistently held that previous determinations apply to fungible information, for example, forms or other similar interchangeable types of information. Therefore, the Houston Police Department was required to seek an opinion on the information Mr. Hall requested.

fort to resolve this dispute, we remind you that section 552.321 of the act the requestor or the attorney general to "file suit for a writ of mandamus compel governmental body to make information available for public inspection if the governmental body refuses to request an attorney general's decision as provided by [section 552.301]

This office urges you to avoid what appears to be, based on the facts presented in the a potential violation of the Open Records Act and immediately release the requested information as it is now presumed to be public information. See section 552. Please know that only the demonstration of a compelling interest in overcoming

Chief Clarence Bradford - Page 2

presumption. *Hancock v. State Bd. of Ins.*, 797 S.W.2d 379 (Tex.App.--Austin 1990, no writ). Accordingly, should you feel that a compelling interest exists, you must forward your arguments to this office for an opinion.

Your prompt response to this matter is greatly appreciated. Should you have any questions regarding this letter you may contact me by calling the Attorney General's Open Government Hotline at 512/478-6736.

Very truly yours,

Craig Leavers
Investigator, Open Records Division

CBL/glg

Encl.

cc:    Mr. J. Earl Hall
       2710 Pecan Court
       Missouri City, Texas  77459
       (w/o enclosures)

145. On October 10, 1997, Chief Bradford informed the open records investigator that since Lt. H

   Bradford in another letter that plaintiff had a special right of access to his internal affairs

   File. Chief Bradford lied. **Here incorporated as exhibit:**



# CITY OF HOUSTON

### Houston Police Department
41 Riesner Street   Houston, Texas 77002   713/247-1000

Bob Lanier, Mayor

CITY COUNCIL MEMBERS:  Helen Huey    Michael J. Yarbrough    Martha J. Wong    Jew Don Boney, Jr.    Rob Todd    Roy F. Driscoll    John Kelley    Felix Fraga
John Castillo      Gracie Guzman Saenz      Joe Roach      Orlando Sanchez    Chris Bell    Judson W. Robinson III    CITY CONTROLLER:    Lloyd Kelley

RECEIVED
OCT 1 3 1997
OPEN RECORDS DIVISION

C. O. "Brad" Bradford
Chief of Police

October 10, 1997

Mr. Craig Leavers, Investigator, Open Records Division
Office of the State Attorney General
P.O. Box 12548
Austin, Texas 78711-2548

Mr. Leavers:

I am in receipt of your correspondence dated September 19, 1997 in which you stated that this department should have requested an opinion from the Attorney General as to whether or not the Houston Police Department Internal Affairs Division (IAD) file was excepted from inspection and/or copying by Lt. J.E. Hall. This department had taken the position that the fact that IAD files were excepted from public release was settled as a matter of case law (see <u>City of San Antonio v. Texas Attorney General</u>, 851 S.W. 2d 946 [Tex. App. --Austin, 1993, writ denied]) and state statute (see Local Gov't Code §§143.089[g] and 143.1214[b]). It is your opinion that Lt. Hall has a special right of access that may take precedence over the case law and state statutes.

Without waiving any legal argument, the department will make the requested IAD file available to Lt. Hall. However, the department reserves the right to request an opinion on any similar request in the future without the taint of the department being beyond the statutory ten-day limit allowed for requesting an opinion from the Attorney General.

Thank you for your cooperation in this matter and if you have any further questions, please contact the Director of the department's Legal Services Unit, Mr. Craig Ferrell, at (713) 247-5460.

Sincerely,

C. O. Bradford

146. In 1999, plaintiff requested documents regarding his relieve of duty under the Brown
Administration and was told by Roland Bienvieu that no such records existed. Officers
within the jail division informed plaintiff that Renita Ferguson spoke to Captain Barber
was the reason that I was relieved of duty.  Exhibit: **Here incorporated is exhibit:**



# CITY OF HOUSTON

**Human Resources Departme**

Post Office Box 1562  Houston, Texas 77251-1562  713/658-37

Lee P. Brown, Mayor

CITY COUNCIL MEMBERS:  Bruce Tatro   Michael J. Yarbrough   Martha J. Wong   Jew Don Boney, Jr.   Rob Todd   Ray F. Driscoll   Jean Kelley   Felix Fr
John E. Castillo   Annise D. Parker   Joe Roach   Orlando Sanchez   Chris Bell   Carroll G. Robinson   CITY CONTROLLER: Sylvia R. Go

**Lonnie Vara**
Human Resources

CIVIL SERVICE COMMIS
Rodney E. Brisco, Chair
Juanita Elizondo, Vice-C
Luecretia Dillard, Commiss

October 11, 1999

Lt. J. Earl Hall
2710 Pecan Court
Missouri City, Texas  77459

Dear Mr. Hall:

This is in response to your letter dated September 23, 1999 to Lonnie Vara requesting
copies of any documentation relating to a 1995 relief of duty (a copy of your letter is
attached).

We have reviewed your official personnel file maintained by our department and have
failed to locate any such documentation.

Should you have any questions regarding this matter, please contact me at (713) 837-
9312.

Sincerely,

Roland Bienvenu
Sr. H R Specialist

RB/rb

147. Plaintiff periodically checked with TECLOSE to determine if the internal affairs division slipped something in his file without his knowledge (2005).

148. Plaintiff asked H.P.D. Executive Chief, Michael Dirden, who was over the Internal Affairs Division, in 2016 when I was attending the farewell party of Rice University Police Chief, who was a member of NOBLE, if my ex-wife had made any complaints against me. Defendant, Michael Dirden, stated no there was no investigations on me.

149. On **May 1, 2018**, Plaintiff made an open records request. See exhibit below. Here incorporated as Exhibit:  including the following:

> **Dr. John "Jay" Hall**
> **Employee No. 77253**
> **17818 Running Brook Ln**
>
> **Spring, Texas 77379**
>
> May 1, 2018
>
> Kelvin Keifer
> Employment and Labor Relations Division
> 611 Walker St 4th Floor
> Houston, Texas 77002
> Please note, I added item 45 regarding documentation concerning Dr. Daniel Belley. Please acknowledge receipt of open records request with an email confirmation.
>
> Email - hr.openrecords@houstontx.gov
>
>
> **Public Affairs Division**
> **Open Records Unit**
> **1200 Travis 21st Floor**
> **Houston, Texas 77002**
>
> Email - hpd.openrecords@houstonpolice.org
>
>
> Dear **custodian of records**:
>
> I am requesting an opportunity to inspect or obtain copies of public records that I have listed below. The purpose of this request is to examine records to determine if existing records

reflected negative information made available to outside agencies of employment and to determine if some documents were omitted from the information gathering process or if inaccurate documents were released to the public or employment agencies. If there are any fees for searching or copying these records, please inform me. Please feel free to clarify subject matter content, date parameters, and names of individuals. Also, state the record retention policy for various kinds of records such as written documents, photos, or audio tapes, along with any notification procedure if records were destroyed.
If you deny any or all of this request, please list the number of each specific request and cite each specific exemption you feel justifies the refusal to release the information and notify me of the appeal procedures available to me under the law. Also, please date your findings for each request and please acknowledge receipt of this open record email request.

The requestors specifically seek access to or copies of the following as per the Local Gov't Code § 143.002. Section 143.089

1) all documents regarding possible or actual infractions committed by the officer from 1981 to 2018;

**Clarification:** Yes, I am referring to myself.

2) all documents reflecting the narrative of **all complaints filed** against the officer and the names of all complainants from 1981 to 2018;

3) all documents reflecting the officer's written responses to **the complaints** from 1981 to 2018;

4) all documents regarding internal affairs investigations and background employment investigations involving the Officer from 1981 to 2018;

5) all documents relating to **the final determination of all complaints** and any disciplinary action taken against the officer from 1981 to 2018;

7b) all documents obtained as part of the background investigation or **complaint** that officer had a **gambling problem** from 1981 to 2018.

7c) all documents with the **name of the complaints** who made allegations that officer had a **gambling problem** from 1981 to 2018.

7d) all credit reports obtained as part of the background employment investigations from 1981 to 2018.

7f) all medical and psychological reports as part of the background employment investigations from 1981 to 2018.

8) all documents released to outside employment agencies supported by a written release by police officer.

8b) all documents removed from internal file that contained information that result in **unsustain** allegations of misconduct, unsustain allegations of mental instability, unsustain allegations of psychologically unfit for duty, and unjustified disciplinary action.

8c) all documents that show that the police officer was notified of **negative information** in his file and was given the opportunity to respond to such information from 1981 to 2018.

23) all Houston Police documents regarding criminal investigation of Tony J. Blacknall by FBI agent, Raymond Jackson around 1999 to 2008.

**Clarification:** Tony J. Blacknall was a confidential informant for the Houston Police Department (Major Crimes or CID). Tony J. Blacknall as a loan officer (with no license) corresponded with City of Houston Building Official Monticello under City Attorney Anthony Hall (no relationship) with respect to the property that I owned in Midtown with the address of 3212 Jackson St. The City of Houston placed a "dangerous building lien" on the property. Tony J. Blacknall was charged by the FBI agent Raymond Jackson under federal **cases H-06-cr-00447 and H-06-323.** **Since I was summoned to the FBI for an interview, I am requesting all records that the Houston Police Department has on Tony J. Blacknall as a confidential informant.** All records that the City of Houston used to correspond with him and his assistance Neisha Jackson along with OPTION ONE MORTGAGE regarding the property located at 3212 Jackson, Houston, Texas. I am requesting all documents that was shared with the Houston Police Department pertaining to the two federal investigations listed above where I was summoned to the FBI office for an interview regarding suspect Tony J. Blacknall. **I was first notified that I was connected in this mortgage fraud case on May 17, 2002 by a company called Impact Funding.**

24) all documents regarding any criminal investigation from 1981 to 2018.

**28) all documents including photos, written statements, and audio taped conversations by Gayland Malveaux provided to the internal affairs division as an anonymous complaint in 1992, 1993, 1994, 1995, and 1996.**

39) all documents related to the city council public hearing when Dr. Diane Rathjen informed Mayor Brown that members of the Houston Police Department were cheating on the promotional exams around 1999 to 2003.

41) all documents generated by **pen registers by the Internal Affairs** Unit or any investigative division from 1981 to 2018.

150. On May 31, 2018, plaintiff received said letter in response to his open record request. In addition, defendants replied that there were no records for items 7, 7a, 8, 8b, 8c. 14, 15, 23, 25, 26, 36, 37, 38, 45.  **Note: Plaintiff received no complaints referring to a criminal investigation or complaints made by his ex-wife.**

151. **Two years later**, Plaintiff made another open records request on **June 11, 2020** and received the following reply: **Here incorporated as Exhibit**:

**From:** Jay Hall <jayearl2007@yahoo.com>
**Sent: Thursday, June 11, 2020 12:48 PM**
**To:** HPD - Open Records <HPD.OpenRecords@HoustonPolice.Org>
**Subject:** (kc 20-06113) Fw: Open Records Request and Open Record Request under 552.023 Special Right of Access to Confidential Information

Re: Open Records Request 20-05522

Attention: Ms. Kimberly

After reviewing Chief Acevedo's letter, I am requesting the complainant offense reports that were required to have a Judge and Prosecutor sign a wire tap application or pen register application.  **Please treat this as clarification of the original request dated 5-28-20**.

Include this information in my open records request. There has to be a complainant (Malveaux). What date were these records destroyed.

Mr. Hall

----- Forwarded Message -----

**From:** Jay Hall <jayearl2007@yahoo.com>

**To:** HPD - Open Records <hpd.openrecords@houstonpolice.org>

**Sent: Thursday, June 11, 2020, 12:08:47 PM CDT**

**Subject:** Re: Open Records Request and Open Record Request under 552.023 Special Right of Access to Confidential Information

Attention: Ms Kimberly

Re: **Open Records Request 20-05522**

See Chief Acevedo's letter attached.

On Thursday, **May 28, 2020, 10:10:10** AM CDT, Jay Hall <jayearl2007@yahoo.com> wrote:

Texas Government Code § 552.023. Special Right of Access to Confidential Information

(a)  A person or a person's authorized representative has a special right of access, beyond the right of the general public, to information held by a governmental body that relates to the person and that is protected from public disclosure by laws intended to protect that person's privacy interests.

(b)  A governmental body may not deny access to information to the person, or the person's representative, to whom the information relates on the grounds that the information is considered confidential by privacy principles under this chapter but may assert as grounds for denial of access other provisions of this chapter or other law that are not intended to protect the person's privacy interests.

This is an official open records request 5-28-20.

Dear Mr. Monk,

I am requesting all police complaints or reports by Gayland M. Hall or Gayland M. Malveaux regarding allegations of domestic violence or money laundering and the dates and locations of these offenses. I am also requesting any investigative notes of these incidents recorded by the internal affairs investigator(s). Further, I am requesting any photo taken of me by Gayland M. Hall or Gayland M. Malveaux that is associated with a police report alleging domestic violence. I am also requesting the names of all the internal affairs investigators who investigated any complaints made by Gayland M. Hall or Gayland M. Malveaux (D.O.B.12-16-58).  Based on evidence in my possession, Gayland M. Hall or Gayland M. Malveaux was part of a conspiracy to frame me for domestic violence; therefore, she made a false report by omitting the name of the person who coached her. Also, please provide me with any Houston Police Reports filed by me listing Gayland M. Hall or Gayland M. Malveaux as a suspect for mailing obscene letters from 1200 Travis. Please provide me with a copy of the basic information available in this police report or any other police reports filed on Gayland M. Malveaux.  Additionally, I am requesting any police reports of domestic violence made against me by Maria Gulliory Hall or Maria L. Guillory.

Thank you,

Dr. John "Jay" Hall

17818 Running Brook Ln

Spring, Texas 77379

Email: Jayearl2007@yahoo.com

832-886-9370

152. On **June 11, 2020**, Plaintiff received one last correspondence from open records by Kim.

**Here as incorporated as Exhibit:**

OR #20-05345 & 20-05522 RE: (kc) Fw: Open Records Request and Open Record Request under 552.023 Special Right of Access to Confidential Information
Yahoo/Inbox

**HPD - Open Records** <hpd.openrecords@houstonpolice.org>

To:Jay Hall

Thu, Jun 11 at 2:25 PM

Dr. Hall,


I did try to call you back but the line was busy and I was unable to leave a message for you.


Let me take a bit to explain what has happened here and why the requested information is nonresponsive.

**First, after searching out our records system, we did not find the names Gayland Hall or Gayland Malveaux. This means that they did not file a police report with Houston Police Department. (Please note that an police report is not the same as an IAD complaint.)**


Second, we sent you a prior ruling letter in April 2019. That letter explains that we are relying on the previous Attorney General ruling regarding this same request. That ruling comes from the letter you sent to us today, June 11, 2020. **This letter does not mean there is no information. It means the information is not releasable due to the fact that the complaint was not sustained and no disciplinary actions were taken.**


The releasable portions, as per the AG, were released to you in October 2018.

We will continue to rely on the AG Ruling #OR2018-19079 and will not release additional information as it is considered confidential.

Because we have no more responsive information to provide, we will close the file on your requests.

Thank you,

Open Records Unit - Kim

**From:** Jay Hall <jayearl2007@yahoo.com>
**Sent:** Thursday, June 11, 2020 12:48 PM
**To:** HPD - Open Records <HPD.OpenRecords@HoustonPolice.Org>
**Subject:** (kc) Fw: Open Records Request and Open Record Request under 552.023 Special Right of Access to Confidential Information

153. Plaintiff pleads to the Court that defendants waited two years after the original May 1, 2018 open records request to acknowledge that the ex-wife didn't file a police report but made an internal affairs complaint. Plaintiff plead to the Court is to use this **new information** from the above email dated **June 11, 2020** to toll the two year statute of limitations for all two year cause of actions because this information identifies the ex-wife as making an internal affairs complaint (misconduct)  which lead to a negative employment reference that violated plantiff's constitutional rights and caused plaintiff's **harm**, injury, and damages.

154. Plaintiff alleges that defendants were aware of the due process laws associated with a criminal complaint and continued to ignore the rule of law: open record decision No. 208 (1978). The Attorney General of Texas Oct. 17, 1978., Law Enforcement Police Bill of Rights (1995), CALEA – Commission Accreditation Law Enforcement Association, and International Association of Police Chiefs.

155. Plaintiff also alleges that Defendants violated the local government code section 143.089 (g) which prohibits disclosure of information reasonably related to a police officer's employment relationship. The exceptions are under section 3(a) (1) which address **information protected** by the **Constitution or common-law privacy**. **Defendants**

**disclosure of the photo taken by ex-wife Malveaux constituted an unreasonable intrusion of that right of privacy** (Texas State Employees Union v. Texas Dept.'s of Mental Health and Mental Retardation, 746 SWd 203 (Texas, 1987).

156. Under 3(a) (1), the test for common-law privacy is whether information contains **highly intimate or embarrassing facts about a person's private affairs** such that a release would be highly objectionable to a reasonable person and the information has no legitimate concern to the public. Industrial Found of the South v. Texas Indus. Accident Bd., 540 S.W.2d 668, 683-85 (Tex.1976).

157. Under 3(a)(1), the protected information can included "false light" privacy if the release of such information would be highly offensive to a reasonable person, that public interest in disclose is minimal, and that there is serious doubt about the truth of the information. **Plaintiff claims that the photo used by Malveaux and internal affairs violated false light privacy protection**. Open Records Decision No. 397.

158. Plaintiff claims that defendants (IAD and ex-wife, Malveaux) **engaged in fraud** upon an EEOC investigative proceedings by concealing the criminal investigation from both plaintiff and his EEOC investigator.

159. Plaintiff further claims that defendants committed fraud by concealing the material fact that defendants were using wiretaps, pen registers, and sting ray devices to conduct unlawful electronic surveillance on plaintiff in violation of his constitutional rights. .

160. Defendants continued their conspiracy of fraudulent concealment despite plaintiff's exercising reasonable due diligence to overcome his initial reliance that defendants would tell the truth and provide facts supporting a cause of action.

161 As a result of defendants' fraud, Plaintiff's First, Fourth, Fifth, Sixth, and Fourteenth
amendments were violated and caused plaintiff injure, harm, and damages.

162. As a result of Defendants' fraud, plaintiff suffered and was harmed, injured, and damaged
in terms of economic loss, interference in employment contracts, business contracts,
education contracts, vehicle contracts, housing contracts, credit contracts, damage
to reputation, emotional distress, loss of future income, humiliation, embarrassment,  loss of
income, and mental anguish.

.

# V. CONSPIRACY TO VIOLATE 42 U.S.C. 1981 BASED on RACE, CONSPIRACY TO USE THE CODE OF SILENCE, and CONSPIRACY TO CAUSE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs hereby incorporate paragraphs 1 through 50 as if fully set forth herein.

163. Under 42 U.S.C. § 1981, Plaintiff claims that the Defendants and Houston Police Officers' operatives violated section 1981**(a),** which provides that all persons within the United States "shall have the same right in every State . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other", (b) "Make and enforce contracts" defined for purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, Section 1981**(c)** protects those rights "against impairment by nongovernmental discrimination and impairment under color of state law."

164. Plaintiff is a member of a racial minority (Black), who experienced discrimination and retaliation by defendants because he complained about defendants manipulating an affirmative action promotional list.

165. Defendants retaliated against plaintiff by framing with a criminal complaint, placing the criminal in his internal affairs file, and failing to notify him of the final disposition date of the criminal investigation for 24 years and counting.

166. Defendants used the criminal investigation as a negative employment references to interfere with the formulation, enforcement, and enjoyment of employment and other types of contracts

167. Due to fraudulent concealment, Plaintiff did not find out that the former City Attorney Anthony Hall was one of the co-conspirators until 9-27-20. Plaintiff received a copy of the tampered promotional list on Oct. 26, 2019 from the City via an open records search.

168. Plaintiff claims that the final decision maker, former City Attorney Anthony Hall, participated and endorsed an unofficial custom or policy of offering preferential treatment to political friends which included participating with them and allowing them to conduct misconduct without consequences. This unofficial custom and practice create a "double standard" of behavior in local government which was discriminatory, retaliatory, and unconstitutional.

169. Plaintiff claims that the Houston Police Department have been trained to break the law whenever a "*politically connected*" citizen is involved. In the court case, **Turner v. Perry**, 278 S.W. 3d, 806, 823 (Tex. App.-Houston, 14th District), **this case parallels how a "*politically connected*" citizen had her traffic citation overturned by the Chief of Police because she was "*politically connected*".** The defendant in this lawsuit (Turner) was the public information officer for Police Chief Lee P. Brown

170. Plaintiff claims this unofficial custom and practice favors the loyalty for political friends over the rule of the law.

171. Neal Trautman, Director, The National Institute of Ethics, who is an expert on the police **code of silence**, identifies this same characteristic in his research. His findings include that

51

73% percent of individuals who pressure officers to keep quiet about misconduct were leaders. Whistle blowers are generally not supported by the police administration leaders. The code of silence among administrators although better camouflaged and less well known is more destructive than when non-ranking personnel do the same thing. The Code of Silence typically conceals serious law enforcement misconduct for years before the corruption is revealed. The code of usually occurs within cultures created by the role Modelling of leaders. The code of silence creates an "us" versus "them" mentality. The widespread indifference to the rule of the law by leaders creates the breeding ground for the custom of non-reporting governmental misconduct. The code of silence fosters a lack of accountability and the rationalization by participants that retaliation is ok because he's not one of us.

172. At the time of the filing of the criminal complaint, Plaintiff was a police officer and was under the **City of Houston police and fireman labor contract**. Section 1981. (*CBOCS West, Inc., supra*, at p. 3.) The latter statute forbids discrimination on the basis of race in the making and enforcement of contracts. (*Johnson v. Railway Exp. Agency,Inc.* (1975) 421 U.S. 454, 459 [95 S.Ct. 1716, 1720].)

173. Defendants violated the terms and conditions of the labor contract in order to retaliate against plaintiff.

174. **The Law Enforcement Officers' Bill of Rights Act of 1995** set forth minimum standards that added to the Omnibus Crime Control and Safe Streets Act of 1968. The standards included: (1) rights of officers while under investigation, **the right to be notified of the investigation prior to being interviewed and, at the conclusion of the investigation, to be informed in writing of the investigative findings and any recommendation for disciplinary action;** (2) rights of officers prior to and during questioning. that the questioning be conducted at a reasonable hour at the offices of the persons conducting the

investigation or at the place where the officer reports for duty (unless the officer consents

in writing to being questioned elsewhere), that the officer be informed of the questioner's

identity, that all questions be asked by or through a single investigator, that the officer be

informed in writing of the nature of the investigation prior to any questioning, that the

questioning be for a reasonable time period, that no threats or promises be made in

connection with an investigation to induce the answering of any question, that all

questioning be recorded in full (and a copy of the transcript made available to the

officer), and that the officer be entitled to counsel (or another person of the officer's

choice) at any questioning (unless the officer consents in writing to being questioned

outside the presence of counsel); and (3) the conduct of a disciplinary hearing, notice of

opportunity for a hearing, requirement of determination of a violation, time limits,

notice of filing of charges, representation, provision of a hearing board and procedure,

access to evidence, identification of witnesses, a copy of the investigative file,

examination of physical evidence, summonses, closed hearings, recordation,

sequestration of witnesses, testimony under oath, verdicts on each charge, the burden

of persuasion, findings of not guilty or guilty, and appeals. Officers can also waive

any of their guaranteed rights.

175. As a result of the constant retaliation, Plaintiff experience emotional distress. Plaintiff

claims that defendants engaged in a conspiracy to cause **intentional infliction of**

**emotional distress** where : (1) the defendants acted intentionally or recklessly;

(2) the defendant's conduct was extreme and outrageous; (3) the defendant's

actions caused the plaintiff emotional distress; and (4) the resulting emotional

distress was severe. Hoffmann-LaRoche Inc. v. Zeltwanger, 144 S.W. 3d. 438,

445 (Tex. 2004) (citing Standard Fruit and Vegetable Co. v. Johnson, 985

S.W.2d. 62, 65 (Tex. 1998). "Extreme and outrageous conduct is conduct so

outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

civilized community".

176. Defendants were aware of the rule of law but felt that their loyalty to their political friends cancelled

out years of legal precedent. As an ongoing conspiracy of retaliation, defendants targeted plaintiff

while he was still employed with the Houston Police Department. Plaintiff applied for the FBI

academy but was deny for less qualified candidates. **Plaintiff retired in 2004** but the post-

employment retaliation ( *Robinson v. York,* 566 F.3d 817  823 (9th Cir.2009) continued after he

retired. Plaintiff will show based on a **preponderance of evidence** that defendants used illegal wire

taps, pen registers, and sting ray devices to interfere with his phone, text, and email messages

communications in order to interfere with plaintiff's formulating, enforcing, and enjoying contracts

because of his race.


177. During the time of the criminal investigation and afterwards, plaintiff was targeted for

various forms retaliation. Defendants and their surrogates **placed drugs** in his rental

property at 6728 Ave B, Houston, Tx. while an assigned an undercover unit parked at the

corner with the instructed to rush in order to allege that plaintiff was selling drugs in his

rental property. Plaintiff's maintenance man, at the time, Santana Flores, informed plaintiff

of the suspicious activity and found the drugs in a vacant unit with a broken lock (1995).  In

hindsight, now, plaintiff understands that defendants (internal affairs) was **using the drug**

**conspiracy to justify an illegal wiretap, pen register, and sting ray investigation(s)**.


178. Retaliation, included the City of Houston neighborhood inspection supervisor, Zapata,

routinely placing repair citations on plaintiff's rental property at 6728 Ave B as a form of

harassment and retaliation.  (1996)

179. Defendants' retaliation included the City of Houston allowing the adjacent developer to encroach on my property at 3212 Jackson St. Midtown, Houston and using illegal pen registers, wiretaps, and sting ray devices to convince attorneys not to help me sue the City for illegal trespassing (1997). Mayor Brown Administration.

180. Defendants' retaliation included conspiring with the Midtown developer to only offer plaintiff $25,000 for a tract of land that was worth a one million dollars once you constructed 3 townhomes on the land (2000).

181. Defendants' retaliation included sending a caseworker to my property to tell my tenants that they needed to move because I was going to sell the property at 3212 Jackson St.(2000)

182. Defendants had plaintiff followed on numerous times by IAD investigators. On one occasion, plaintiff was able to copy the license plate number of the investigators' vehicle before the investigator sped off. This incident occurred on **March 15, 2002**, a white male investigator, w/m/50, with mustache, in a **green aurora license plate, NCD 955**, followed me to Highway 6 and Glen Lakes. Note: This field surveillance had no proximity to the criminal investigation referenced in the May 31, 2018 letter so why was it done.

183. Defendants' retaliation included placing a ***dead body*** **in my property at 3212 Jackson St.** to scare my tenant into moving. A close friend of mine, Gerald Mills, accompanied me to the property to witness the dead body. Homicide Detective, whom I worked with in patrol, just laughed when I called him about the incident (2000). Defendants were interfering in a business contract. Name can be provided if needed.

184. Plaintiff contacted Mayor Lee P. Brown to inform him of the illegal encroachment and the illegal wiretaps and pen registers being used to conduct illegal surveillance on me. Brown, a final policy decision maker, did nothing after receiving my letter in 2001.

185. Defendants' retaliation included threating me not go to City Council to ask that my property be grandfather but instead the City of Houston placed an *improvement lien* on my property (3212 Jackson property) and forced to resign from the police department in order to use my pension funds for the repairs. Mayor Brown and Anthony Hall authorized the improvement lien on the property (2002).

186. Defendants, as retaliation, introduced me to a police confidential informant, Tony J. Blacknall, who worked with the City of Houston, whose purpose was to entrap me in the crime of mortgage fraud. Blacknall financed three of my properties. Blacknall was in contact with the City of Houston housing director, Beatrice Leak and a lady named **Monticello Flanagan** (2000), who worked for City Attorney Anthony Hall. State real estate licensing records confirmed that Blacknall was never licensed in any capacity to conduct real estate transactions.

187. Defendants, as retaliation, coached Tony J. Blacknall, the informant, to use my company *logo Hall property* to purchase a separate townhome. I was later told by an officer working in the Major Offenders Unit that Blacknall was told to frame me (2000-2001). This officer requested anonymity to avoid retaliation himself.

188. The mortgage company contacted me about the real estate transaction as if I had knowledge of the fraudulent transaction. I conducted my own investigation and discovered that Tony *Blacknall had no real estate license of any kind, so how was he able to refinance three of my properties.* I conducted an air tight case against Blacknall *for identify theft* and filed the case with the FBI office (2002). **Blacknall was arrested seven years later in 2007.**

189. At the time of this retaliation period, Defendants were promoting 12 Assistant Chiefs.  The Defendants connect me to the Tony Blacknall case, their own informant, to prevent me from being considered  for one of the 12 assistant chief positions (2000—2002).

190. In 2004, defendants forced plaintiff  to resigned from the Houston Police Department so that he would use his pension funds to remove the City of Houston repair lien placed on his property at 3212 Jackson St. when he refused to sell. This was retaliation and interference in a business contract.

191. In 2005, plaintiff received a certificate of residence from the City of Houston, signed by Lee P. Brown, the Mayor of Houston.

192. In 2007, plaintiff discovered his wife (Maria) cheating. Plaintiff moved out. Plaintiff went through seven divorce attorneys. Maria was told to file affidavits claiming domestic violence against me despite her being arrested twice for domestic violence by the Missouri City Police Department. IAD told Maria that they would help her. Maria filed one affidavit the claimed she was entitled to half of my pension which was a lie.  I was entitled to 95 percent of my pension. Maria Guillory told me in 2018 some years later that the internal affairs division told her to lie in order to help her get part of my pension. Maria was at the Casino celebrating with her mother who has a birthday on the day after mine. This was another **marital contract** that the internal affairs division got involved in.

193. During his divorce from Maria Guillory, Plaintiff fired one attorney who was a friend of Attorney Shamika Scroogins. This attorney was working with the internal affairs division and was trying to have my peace officer's license revoked based on the false affidavits that Maria was told to place before the Court. Again, there was no official police report made by

Maria. Attorney Shamika Scroogins is the daughter of the President of Unity Bank. Lee P. Brown is a board member of Unity Bank. The false affidavits were retaliation.

194. Defendants (IAD) showed my new attorney Martin Simon the Malveaux photo (2007). I suspect this was the criminal investigation cited in the May 31, 2018 letter. My attorney Martin Simon who was supposed to be representing me allowed Maria to place false affidavits in the court record without my knowledge in an attempt to give her 50 percent of my pension which was legally impossible unless the Judge accepted the false affidavits as true. Attorney Martin Simon acting on the instructions of the internal affairs division, without my knowledge, wrote a check from her personal bank account to complete my pension paperwork. This was another act of retaliation because I am black and IAD contract interference.

195. Plaintiff's attorney, Martin Simon, she told him that IAD was on both my phone and Computer and that they were going to help Maria take 50 percent of my pension. Atty Simon said she wouldn't do anything about it. This information confirms the illegal practices of using wire taps, pen registers, and computer hacking that was cited in the May 31, 2018 letter. This retaliatory incident took place in 2007. It also shows IAD's interference in a marriage contract.

196. Plaintiff friend, Harry Landry, the husband of Shamika Scoggins, told me that IAD was trying to take away my pension and take away my peace officer's license by allowing Maria to place false affidavits in the court record. This retaliation occurred in 2007.

197. In **2006**, plaintiff applied for a police chief job in **San Jose, CA.** Once I came back for my final interview, I received the strangest look from the board members and was later rejected. I believe the IAD division used the pen register and HPD computers to leak out the photo or the criminal investigation referenced in the May 31, 2018.

198. After plaintiff's 2007 divorce, Defendants continued their conspiracy to interfere in his

Contractual right to go to acquire his Phd. from Capella University.  After flunking a

comprehensive exam in 2008, Plaintiff was ordered to take a remedial academic writing

course. At one point, Dr. Meredith informed plaintiff that he had not received any of

plaintiff's assignments and that he would have to fail plaintiff.  Plaintiff couldn't

understand why Dr. Meredith had not received his assignments. Dr. Meredith stated

that he would contact the University's information system section. Once Dr. Meredith

contacted Capella's IT section. All assignments were released to Dr. Meredith.  Dr.

Meredith once he read my assignments, he stated that you don't have a writing problem and

used me to tutor other students in the class.  Plaintiff made A grades in both courses. I

moved to Las Vegas to get away from the internal affairs retaliation but it continued.

199. Plaintiff was told by Capella University comprehensive exam proctor, Gambon, that if he

felt too **much pressure**, then,  just let him know and he want stop the exam (**2011**). I

suspected that once again defendants were leaking out the content of the May 31, 2018

criminal investigation and illegally using wire taps, pen registers, and computer hacking to

interfere in plaintiff's right to enter into an **education contract**. Chief Bradford had told

the Houston Police Department members that I was paranoid so therefore this was the

false narrative placed in my IAD file without my knowledge.

200. Defendants accessed my medical records at Capella University (eye exam).

Defendants interfering in **health care contracts (2016)**. See email.

201. Plaintiff's computer was hacked many times during his tenure at Capella

University. In **recruiting participants**, plaintiff computer was hacked. Plaintiff

believes that the criminal investigation cited in the May 31, 2018 letter where

pen registers, wiretaps and computers were being used for surveillance were now used

to illegally interfere in plaintiff's **education contract (2009)**.

202. Plaintiff's computer was also hacked when taking his comprehensive exam. My test was scrabbled in front of my own eyes and my cousin's eyes while in Las Vegas. Defendants interfering in **education contract** (2009). See email.

203. Plaintiff sought employment while in Las Vegas. He was scheduled to work with a **private investigator** but when the start date arrived. He was rejected. Trina Adams, an HPD officer, who contacted me in Las Vegas and asked me to prepare an affidavit for her attorney regarding a Captain Adams who used the "N" word toward a group of black officers. I filed the internal affairs complaint on Captain Adams. Officer Trina Adams said she needed to affidavit because this same Captain referred to her as a "girl" or wrench. I prepared the affidavit as she asked. She said that she was told by **Craig Ferrel**, the same individual over the police legal department that orchestrated the manipulation of the Edwards' promotional list, that he could stop Hall from getting a job in Las Vegas because he knew **Sherriff Gillespie**. **(2007)** Defendants interfering in **employment contract**. Ferral was the same individual who along with the former City Attorney Hall placed the co-conspirator on the promotional list.

204. Plaintiff returned to Houston after his comprehensive exam was scrabble in front of his eyes and his cousin's eyes. **Plaintiff appealed the grade failure**. In addition to the computer tampering,  plaintiff was informed by his tenant in Houston that **two white police officers** came to his home which he was leasing to Miki Barker and informed her to stop paying the monthly lease payment. I was forced to return to Houston and pay to get the property **out of foreclosure**. In addition, someone helped **Miki Barker** filed a pauper petition to move the **eviction case** from small claims court to county court. I had to live in a studio apartment and pay my home mortgage for nine more months. When the case was finally resolved I lost $20,000

dollars in back rents and damage to the property (2010). This was retaliation and interference in a **housing contract**.

205. Plaintiff's old neighbor informed him that Miki Barker worked at the airport. \
See information in exhibit section.

206. At Capella University, plaintiff was assigned a mentor who at one time worked at Methodist Hospital in Houston. (2012).

207. Plaintiff's mentor, at Capella University, provided him with inaccurate information which lead to a year of wasted instructions. Increasing Plaintiff's student loan to $100, 000 more than necessary.(2012). Defendants interference in his **employment contracts** has lead to plaintiff's inability to pay his $246,000 in student loan debt. This was retaliation.

208. Plaintiff' tried to recruit Black police chief's from NOBLE, a black law enforcement organization, for his research dissertation and no one would participate. Plaintiff's attributes their refusal to the code of silence and retaliation by co-conspirator, Lee P. Brown, a founder of that organization (2013). Defendants were interfering in plaintiff's **education contract**.

209. Defendants cited in this lawsuit were all members of NOBLE: Dirden, Dodson, Ferguson, and Bradford (2013).

210. Plaintiff suggested new police training to the NOBLE organization to improve community relations. NOBLE leadership indicated no interest but a member went behind plaintiff's back to mention neuroscience training on CNN. See document in exhibit section (2015). This was a form of **training contract** retaliation.

211. Plaintiff contacted a Latin Police Organization about recruiting their members to participate in his dissertation research. They too, disagreed to participate. See document in exhibit section.  Local police leaders affiliated with that organization were former Sheriff Adrian Garcia and Chief Art Acevedo. Former Sheriff Garcia was given a platform by Mayor Lee P. Brown. I consider myself a personal friend of former Sheriff Garcia. We worked together but still no one would participate (2012). This was a form of education contract retaliation.

212. Plaintiff continued his recruiting of law enforcement personnel. Plaintiff contacted Sergeant Clifford Pope who also attended **Capella University**. Sergeant Pope had graduated before me and therefore was referred to as Dr. Pope. Plaintiff asked Dr. Pope, who lived in the Atlanta area, to see if any of his old law enforcement buddies would be willing to participate in my dissertation research. Brown was the Chief of Atlanta at one time. (2013) Plaintiff believes that IAD used pen registers to contact Dr. Pope.

213. Plaintiff received an **audio clip of an interview** from Dr. Pope a week later. This **audio clip** represented a direct violation of the ethical policies and procedures by **Capella University** for conducting human research. Dr. Pope was a graduate of Capella University so he knew that this was a blatant violation and that **I would be terminated by the school  (2013). This was a form of retaliation by defendants interfering in plaintiff's education contract.**

214. Plaintiff's mentor, informed plaintiff that he believed that plaintiff was not doing his own work; therefore, the mentor **scheduled a meeting with the dean** and requested that plaintiff provide him with all transcripts that he had for his dissertation research (2013). This meeting was racially motivated because I was black.

215. Plaintiff provided mentor Nowill with all transcripts except the corrupt file provided by
Dr. Pope. (2013)  See document in exhibit section.

216. At the meeting, **mentor and dean tried to provoke plaintiff** by making unfounded
allegations that were inaccurate with respect to Plaintiff's research and methodology. Once
again, the angle used by the mentor and board members was that plaintiff was *emotionally
unstable and if you provoke him he would come unraveled.* As I previously stated, I believe
this information was gleaned from the internal affairs division framing me in the criminal
investigation cited in the May 31, 2018 letter (2013). This was another incident where
defendants had been interfering in my **education contract**.

217. At the conclusion of the meeting, I told the board that I could no longer work with
my current mentor.  During the meeting, I informed the board that my mentor was
unfamiliar with my research methodology and that gave me a copy of his dissertation
to me to use because he was unfamiliar. The board finally caved in and agreed to change
my mentor. Once I received my new mentor who was familiar with my methodology and
who had two Phds., I was able to complete my dissertation in six months where under the
old mentor, he had wasted two years of my time (2013). Again, this was an example of
defendants interfering in my **education contract**.

219. Defendants also established a pattern of interfering **with vehicles that he purchased**.
Defendants were jealous of my life style and sought to do everything in their power
to interfere. Plaintiff purchased a 2007 Porsche through GMC financial in **2012.** Plaintiff
used Chase bank's computerized bill pay system. Plaintiff believes that defendants hacked
into the banks computer system or contacted a bank employee and informed them to not
make two automatic payments.  **I received a repossession letter GMC financial**. Once I
contacted the bank, the two payments were immediately placed back into my account
so that I could pay the two delinquent car note payments. I demanded GMC financial to

produce the checks so I could determine the date the bank forwarded them to pay the car note. The Hispanic manager refused to cooperate with my request for the cancelled checks and demanded that I file a lawsuit. I voluntarily returned their vehicle. I suspected defendants had interfered in my **vehicle contract as retaliation.**

220. In another vehicle contract situation, I when to One Main Financial Service for a personal loan of $500 dollars. The Hispanic loan officer to my surprise came back and suggested without me asking, that they would add my loan balance of $5, 000 to the balance of my 2016 Nissan Rogue which was $18,000 and finance the total amount for 15 years. The total debt that I would owe the Hispanic loan company would be $50,000 dollars. I felt this suggestion was somewhat suspicious because the financier for the 2016 Nissan Rogue was a Hispanic car finance company named Santander. The Hispanic loan officer told me that she could give me $7,500 cash up front to do the deal and that I could do anything that I wanted with it. I suspected she mean "gambling". After some minor calculations, once I added my mortgagor to the list, all my police pension funds would be paid to business contracts with Hispanics. Based on this financial conspiracy involving the personal finance One Main, Santander, and my mortgage with Carlos Sauzo, a pattern emerged implying that Hispanics were involved in the internal affairs conspiracy. I returned the 2016 Rogue based on this company's decision to join the internal affairs conspiracy of alleging that I was a professional gambler.

221. Plaintiff purchased another vehicle in 2019 from Oasis Car Dealership. On October 14, 2020, some unknown group of individuals tried to steal the 2007 Mercedes SUV from out of my driveway with an external device that imitates your car key signal. My police dog detected the intruders and they ran leaving the driver side door open. The car payment is made religiously every end of the month. Plaintiff believes that this was retaliation by the internal affairs division for formulating this lawsuit.

222. The conspiracy and the retaliation continued after I received the position. On 3-13-98,
I spoke to Paula Fournier who was **leasing my home at 6339 Ludington**. Ms. Fournier
informed me that she was moving out because a process server met her cousin, Glenn Jones,
in the front yard of the home and show him that the maintenance fees were delinquent and
that the property was going to be foreclosed on. When I contacted the mortgage company
for the 6339 Ludington property, the mortgage rep stated that they didn't create any
foreclosure documents nor did they place the foreclosure on my credit report.  Defendant
Renita Ferguson works at the Houston Police Federal Credit Union.  Defendants were
retaliating and interfering in a real estate contract.

223. In another real estate contract, Plaintiff moved to Las Vegas to get away from the
retaliation. Plaintiff leased his property located at 17310 Beaver Spring Dr., Spring, Texas
to Miki Barker. While in Las Vegas testing, Ms. Barker stated two white Houston police
officers came by looking for him. Ms. Barker stated that the officers told her to stop paying
the mortgage during a phone conversation. After a month, Plaintiff received a foreclosure
notice in the mail for non-payment of the mortgage from Keeling Law 713-686-2222.
Plaintiff was taking a comprehension exam from Capella University. As Plaintiff and his
aunt  were preparing to submit his exam, the computer scrabble his exam in front of him.
Plaintiff flunked  his exam. **Sergeant Kenneth Perkins** contacted plaintiff in Las Vegas
and asked him how did his exam go. I never discussed  with Sergeant Perkins that I was
taking an exam.  I knew at that point that Sergeant Perkins, a retired Houston Police
Sergeant, was part of the conspiracy.

224. After placing all my belongings in storage, I headed to Houston to save my home from
foreclosure.  Defendants had once again interfered in my housing arrangement as a
form of retaliation to cause emotional distress. Below is a telephone text description
documenting internal affairs officers visiting my property, slandering my name, and

instructing my tenant not to pay the mortgage (7-19-2010). Below is a copy of the date of IAD officers visit from court record.  Exhibit. **Here incorporated as exhibit**:

**July 13, 2010**

EV42C5039233 HALL V. BARKER

JUDGE  TOM LAWRENCE , JUSTICE OF THE PEACE, PRECINCT 4, PLACE 2, 7900 WILL CLAYTON PKWY

EVICTION INDEX:

A.  SIGNED LEASE
B.  30 DAY NOTICE (VIOLATE TERMS OF LEASE)
C.  3 DAY NOTICE  (NON-PAYMENT OF RENT/SUPERCEDE)
D.  COURT PETITION
E.  EVIDENCE
   1).  20 PAGES OF TEXT MESSAGES (FALSE AND INCONSISTENT STATEMENTS)
   2).  FOSTER CARE LICENSE
   3).  REPAIR RECEIPTS
   4).  PICTURES OF PROPERTY CONDITION
   5).  AFFIDAVIT  OF REALTOR (CATHY DAVIS)
   6).  WITNESS TESTIMONY
   7).  LIST OF LEASE VIOLATIONS (JUNE 1, 2010)

F.  TEXT MESSAGES FROM MS BARKER ON VARIOUS  SUBJECT MATTER

   1).  5-4-10 Damage to game room ceiling repaired; will eventually fall thru
   2).  6-7-10 Plumber observed water on ceiling;  run argur; No busted water pipe
   3)  6-10-10 Plumber run argur a second time to unclog drain; complete ceiling  down
   4)  4-3-10  Give Kuper repair receipts with rent
   5)  4-16-10 If you use the heat, the house will burn down.
   6)  4-26-10 I never met Mr. Kuper
   7)  4-26-10 Accusations  of threats and harassment by Ms Barker against Mr Hall
   8)  4-26-10 I will move in May
   9)  3-1-10 Good luck on test
   10)  5-4-10 A couple of law enforcement officers came by asking questions about u.
   11)  5-4-10 I am sending u a repair letter
   12)  5-3-10 You are not liable for an inspection
   13)  6-8-10 You go to court. All I have to do is sit back and watch the show.  This is fun.

225. After getting the house out of **foreclosure** and filing for the eviction, defendants influenced the small claims judge to allow the Ms. Barker to claim that she had the ability to pay $4,600 for an appeal bond to county court when she couldn't pay the $1,560 in rents that caused the eviction. As a result, Ms. Barker was allowed to destroy my property and stay in it nine more months without paying rent. Defendants knew that they were intentionally causing emotional distress (case Ev42c5039233) Judge Tom Lawrence. The total damage to plaintiff's property was about $18,000 **(2010).** Defendants interfered in **housing contract** as a form of retaliation.

226. Plaintiff engaged in home financing with Eva Grant at 2710 Saddle Creek Dr. Ms. Grant attempted **foreclose** on the Plaintiff's home on three occasions by withhold check payments made to the bank. Ms. Grant called her attorney to file foreclosure papers on me. Plaintiff believes that this was another incident of defendants retaliating and interfering in a housing contract (2012). When trying to refinance the property with Quicken Loans Mortgage, the loan officer implied that I was a gambler and that he couldn't accept money orders. I filed a housing complaint against Quicken Loans and they were finally told that they were discriminating me for not accepting proof of mortgage payment by money orders rather than checks. Once again, this is an incident where defendants were interfering in my **housing contracts** using the **professional gambling lie** told by the ex-wife as an excuse for an illegal criminal investigation. This was retaliation in my housing contract. Exhibit incorporated here on exhibit sheet.

227. After a faulty roof and water damage to the 2710 property, I sold the property to investors. During my home search, I leased the home that I now currently own at 17818 Running Brook Ln. The owner of the home, a Hispanic police officer, Carlos Sauzo, asked me if I wanted to purchase the property. I told him sure; then, he changed his mind.  I began looking for another property. In the middle of securing another property, the owner of the 17818

Running Brook Ln informed me that he would sell me the property based on what he owed. I agreed but later found out that he lied about owning delinquent home owner associated fees. When I contracted the home owners association that told me that they could foreclose on the home because I am still responsible for the $3,000 that he owes. Mr. Sauzo assured me at closing that the association fees were all paid. I believe this was another incident where defendants (IAD) are using pen registers or sting ray devices to interfere in my **housing contracts (2019)**.

228. Defendants also dumped fraudulent collections on his **credit report**. Plaintiff sued the Houston Police Credit Union for placing fraudulent items on his credit report. Defendant Renita Ferguson was a board member (2007). I believe the fraudulent entries were retaliation.

229. Defendants placed fraudulent **collection entries** on my credit report which I had to pay in order to obtain student financial aid. I pay these fraudulent collection entries (OSO ___) so that I could complete my education at **Capella University**. A year later, the ombudsman of the Consumer Credit Service refunded my payment. This was retaliation. **(2013)** See information in Exhibit Section. Defendants were trying to keep me from completing my Phd. Defendants interfered in **education contract** as a form of retaliation. See exhibit here incorporated on exhibit log.

230. Plaintiff purchased another home at 2710 Saddle Creek Dr. Houston, Tx. on contract with an investor, **Eva Grant**. Initially, Ms. Grant was friendly. Ms. Grant left remodel work undone. Told my neighbor that I was a piece of shit. Ms. Grant pretended that she was drunk and made **sexual advances** after she left the rest room at 2710 Saddle Creek Dr. Ms. Grant was working with the internal affairs division. Maybe, Ms. Grant was trying to help the IAD division to frame me for sexual assault. In addition, Grant's animus was apparent when

68

**she attempted to foreclose on the 2710 Saddle Creek Dr**. property on

three occasions by withholding my payments and having her attorney contact

me **(2012). Below is a copy of an affidavit** written from my next door neighbor regarding

comments by Ms. Grant about me after I moved out due to black mold infestation due to

roof leaks sold the property to an investor and the email referencing the refusal of Quicken

Loans to refinance the property because I paid Ms. Grant in money orders instead of checks.

This is another example of defendants interfering in plaintiff's housing contracts. See

Exhibits below. **Here incorporated as exhibit**:

May 26th, 2017

Jerome Van Zandt Sr..
1714 Saddlecreek Drive
Houston TX 77090
Telephone # (404) 547-3798

On or about May 9th, 2017 around 2pm, I Jerome VanZandt was approached by someone, later to be
known as Ms. Eva. She inquired about my next door neighbor, Jay.  She wanted to know if I had seen
him recentlyand if not, when was the last time I saw him?  She then inquired if I knew what was going
on with him? I replied that I didn't know.  I was under the impression that he was moving and didn't
know if he had finish.

Ms. Eva informed me that Jay is a con artist;  and  that she didn't know if he worked  for the
FBI or was some sort of spy. She stated that he didn't pay his bill and he was hiding from the
obligation to do so. She was with someone else, he seemed to be a handyman/contractor.
He told me that they couldn't catch up with Jay, he owed them money and had not paid
in months. I told them he seemed to be a nice guy. They continuted to call him a low
life. I told them again that I had not seen Jay. I left and noticed that they stayed out front for about 15-
20 minutes after I left.

Jerome Van Zandt, Sr.

**Sworn to and Subscribed Before Me**
**This 26 day of May.       20 17**

**Notary Public Signature**

RUBY PEREZ
Notary Public, State of Texas
Comm. Expires 03-10-2020
Notary ID 130575974

Exhibit: Here incorporated as Exhibit:

**Housing: Quicken Loans Refused to Accept my Money Orders to Eva Grant (2014).**

On Tue, Dec 9, 2014 6:11 PM CST Glasgow, Randal B wrote:

>Dear Mr. Hall:
>
>Investigator Crenshaw has stated that she has found that Quicken Loans did not follow their guidelines as you stated.
>
>Quicken Loans has stated that they would like to conciliate your complaint.  They have stated if all the information is submitted to them they will approve the loan.  The issue of the payments made by money orders has been addressed with them.
>
>I am waiting to see if their offer would or would not include any new fees for the loan.  Waiting to hear back from them.
>
>Once I get a full understanding on what they are offering you I will forward that information to you and you can advise if you accept, reject or have a counter offer.
>
>Sincerely,
>
>
>Randy Glasgow
>
>-----Original Message-----
>From: Jay Hall [mailto:jayearl2007@yahoo.com]
>Sent: Monday, December 08, 2014 2:59 PM

231. Plaintiff claims that the internal affairs division intentionally discriminated and retaliated against him based on race by  conducting a bias and ongoing investigation aimed at sabotaging every contract plaintiff entered into. Plaintiff states that the Internal Affairs Division obtained documents from plaintiff's divorce proceeding and used those divorce documents to claim that plaintiff was a professional gambler without any proof.  Plaintiff further claims that defendants (the internal affairs division) used illegal wiretaps, pen registers, and sting ray devices to help ex-wife locate community property that was in my bank account. Below are exhibits showing my income inventory in divorce court and  evidence of officers with gambling problems.  Exhibit. **Here as incorporated** as exhibit.

## Set IV

## Expenses / Income After Temporary Order and Return to Duty

**Gail's Expenses**

| Creditor | Balance | Payment |
|---|---|---|
| VISA | 5021.00 | 57.00 |
| MasterCard | 2429.00 | 57.00 |
| Bank One / VISA | 2800.00 | 50.00 |
| Car Insurance | | 150.00 |
| Rent | | 250.00 |
| Telephone | | 80.00 |
| **Total Expenses** | | **$ 644.00** |

**Jay's Expenses** (May - Nov. 95)

| Creditor | Balance | Payment |
|---|---|---|
| Consumer Credit Counsel | | 431.00 |
| Discover Card | | 57.00 |
| Radio Shack | | 57.00 |
| * HPCU | | 284.00 |
| Rent | | 800.00 |
| Insurance / Pat Thonen | | 131.00 |
| MBNA | | 100.00 |
| Truck Repairs | | 100.00 |
| Truck Insurance | | 100.00 |
| Lease Supplement | | 200.00 |
| Palais Royal | | 30.00 |
| Legel Fees / EEOC | | 200.00 |
| Legal Fees / Divorce | | 400.00 |
| SW Bell | | 200.00 |
| Mother / Daughter | | 100.00 |
| **Total Expenses** | | **$ 3,190.00** |

**Gail's Income**

| Source | Income |
|---|---|
| HISD (Employment) | 2100.00 |
| **Total Income** | **$ 2,100.00** |

**Jay's Income**

| Source | Income |
|---|---|
| HPD (Employment) | 1300.00 |
| Extra Job | 1800.00 |
| **Total Income** | **$ 3,100.00** |

**Difference (Income - Expenses)      $ 1,456.00**

**Difference (Income - Expenses)      $ (90.00)**





232. Defendants (Malveaux) lied about their internal affairs complaint and the **probable cause** for using a wiretap and pen register as referenced in the **May 31, 2018 letter**. Defendants could have subpoenaed plaintiff's bank records and tax records. This was a requirement that had to be stated in defendants wiretap and pen register application. The **professional gambler** claim by ex-wife and the internal division was part of the conspiracy to justify the illegally use a wiretap or pen registers. **However, the term originated by my divorce attorney when he suggested that I tell Judge Dempster that I was a professional gambler and that she would go easy on me.** There no court records confirming this lie. My divorce attorney was politically connected. My police friend, referred me to attorney **Dan Pappas** who handled his child support claim. Why would any attorney tell you to make a false statement in Court under oath unless they couldn't prove that you were a professional gambler, so the defendants sought an admission under oath to corroborate the false statement made by the ex-wife, that I was a professional gambler, in order to justify the internal affairs division use of what we now know to be illegal wiretaps, pen registers, and sting rays devices. While this is not a disparate discrimination complaint, the following comparison of how I was treatment as a black in comparison to white officers with gambling problems is significant in supporting my cause of actions. Note: IAD was investigating me with respect to my community assets. In 2004, a police officer working for the police credit union stole $656K and his attorney informed the Judge he had a gambling addiction. In 2008, an unknown police employee stole $100,000 from the credit union vault. In 2016, an employee stole $1.5 million from the police credit union.  Co-conspirator Ferguson was a board member to the police credit union; however, she was unable to detect theft occurring from under her nose because she and the department was more concern with retaliating against me for not receiving a position that she wasn't qualified for to begin with. Plaintiff claims defendants were driven by the code of silence, racial animus, and municipal corruption.

233. Defendants and the internal affairs division concealed from the criminal complaint referenced in the May 31, 2018 letter that Defendants Renita Ferguson and Malveaux would meet at President and First Lady's Gym to strategize on how to get plaintiff disqualified from the affirmative action position (1993). Contrary to what the police department might said at this juncture, Ferguson was acting in her capacity as a promoting seeking co-conspirator and a bitter sergeant who sought means to retaliate against plaintiff after she didn't get the promotion. Once plaintiff got promoted, the retaliation continued in other contractual areas.

234. The conspiracy between Malveaulx and members of the Houston Police Department was further verified when Malveaux and Joe Livington, an HPD lieutenant, forwarded an obscene letter to plaintiff residence in Missouri City, Texas in 2000 from 1200 Travis. **In March 10, 1999, Lieutenant Hall received an obscene letter mailed to his home address with a forwarding address of 1200 Travis Street**. This was the address of the Houston Police Department. My wife, at the time, Maria Guillory Hall, recognized the handwriting on the envelop and letter as belonging to a Lieutenant, whom she worked with in Special Operations. She stated that the Lieutenant wanted to date her at one time. After reading the obscene letter, I determine that there were two individuals involved. I suspected that the second individual was **Gayland Malveaux, my ex-wife, since the second letter hurled profanities at my daughter and her mother, who lived out of town. In addition, the second letter disclosed personal information that was shared with my ex-wife, Malveaux, which the Lieutenant was not privy to.** The second letter was directed at Marilyn Jean Hall, my daughter's mother. As I stated in a previous chapter, the police department will use anyone to retaliate or harass you and most people comply because a police officer, a manager, or a chief can use their discretion to give them a "get out of jail card free". In an effort to confirm my suspicions regarding the parties involved, I hired a forensic document examiner. Based on acts of past retaliation involving my relief of duty, I reported the incident to IAD but didn't expect that they would conduct a fair and impartial

investigation regarding this matter. In anticipation of this, I hired Roberta J. Hanna, a certified document examiner. Enclosed is a copy of Ms. Hanna's report. After making an IAD complaint, the Chief of Police assigned two **Hispanic Officers A.R. Reza** and another officer, to investigate my complaint under I.A.D. **case number 99-1558**. A meeting was set up at my residence to discuss the incident. Upon arrival, I noticed that the behavior of the two officers from IAD were somewhat strange to say the least. As one would talk to me, the other started roaming around the house asking who else was present. I became alarmed and told them that I needed to speak with them together not separate. Based on their behavior, I went to the kitchen cabinet and placed a small revolver underneath my loose fitting gym sweats. After they both sit down on the living room couch, I gave them copies of the letters and keep the original as instructed by the document examiner.

The officers gave some excuse while they needed the original. When I failed to comply, they left. As a detective, I viewed their behavior as not only strange but scary. Once the document examiner completed her investigation of the obscene letter, I forwarded a copy to internal affairs, investigator, Reza. I don't recall receiving a disposition of the case from him. Later, I discovered that my suspicions of these officers behavior was not a figment of my imagination. **In June of 2002, Sergeant Andres Reza, age 37, of the Internal Affairs Division, the same officer who was sent to investigation my obscene letter, was arrested by a task force of police officers after discovering that Sergeant Reza, used his internal affairs position as leverage to kidnap the common-law wife of another police officer in an attempt to extort money** from the couple who owed several cantinas or bars. See copy of obscene letter and copy of document examiner's investigation and findings. Exhibit. **Here incorporated as exhibit**:

CONTENTS:

Marie is a Dick
Sucker who is a Bitch.

If my Good to have
Been Able to fuck her
in her Ass.

I did her, Now keep the
Slut

1200 TRAVIS
HOUSTON TEXAS
77002
RELATED CASE

HALL
210 PEACON COURT
M.O. City TEXAS
77454

# *Roberta J. Hanna C.D.E.*

Certified Forensic Document Examiner
2950 North Loop West, Suite 500
Houston, Texas 77092

(713) 683-1530                                    Fax (713) 683-0773



December 14, 2000

Jay & Maria Hall
2710 Pecan Court
Missouri City TX 77459

Re: Forensic Document Examination of Obscene notes & Envelopes.


On November 11, 2000, I was retained by Mr. Jay Hall to examine two obscene notes with envelopes. My assignment for this case is to determine if possible if the same person who wrote each note is the same author.

## I.      QUESTIONED *DOCUMENTS* :

Q-1.    Note beginning "Jean". Four lines. The day 'Sunday' noted at top right, print/script mix style.. Penmanship. Original.

Q-2.    Note beginning "Maria. Six lines of print/script style penmanship. Original.

Q-3.    Envelope addressed to "Jean Hall, 407 Taft, Gary Ind. 65308. Return address J.E.Hall, 2110 Pecan Court, Missouri City, TX. 74059. The stamp was not secured with glue, it is taped on the letter. Only a portion is secure. '*RETURN FOR POSTAGE' IS STAMPED* , with a note explaining the Postal requirements for delivery. No folds on the envelope. There is no postal stamp for date. Original.

Q-4.    An envelope addressed to 'HALL, 2710 PECAN COURT, M.O. CITY TEXAS  77454. The return address shows to be 1200 Travis, Houston, Texas 77002.  A stamp **RELATED CASE'** is stamped below return address. The envelope has been folded.  A Hospice Care 33 cent stamp was used. The postal date, March 10,199. Original.

## II.     *STANDARDS PROVIDED FOR COMPARISON:*

S-1.    One sheet 'CIVIL SERVICE COMMISSION CITY OF HOUSTON, ANSWER SHEET.' Name Joseph Levingston, examination, Police Class 105, Date 9-2-82. Photocopy.

S-2.    EXHIBIT 1, CITY OF HOUSTON EMPLOYMENT APPLICATION. Name Joseph Ray Levingston, date 4/15/82. Photocopy.

S-3.    EXHIBIT 2, CITY OF HOUSTON PERSONNEL DEPARTMENT, HOUSTON, TEXAS 77001. NAME, Joseph Levingston. Date 9/23/87. Photocopy.

S-4.    EXHIBIT 3, TEXAS COMMISSION ON LAW ENFORCEMNET OFFICE STANDARDS & EDUCATION. Name,Joseph Levingston.  Date 9/7/82. Photocopy.

S-5.    EXHIBIT 4, EDUCATIONAL INCENTIVE PAY FORM.  Name, Joseph R. Levingston Sr., date 9 3 88. Photocopy.

Ray Hall, continued, 2

S-6.     EXHIBIT 5. RECEIPT OF REPRIMAND. Name, Joseph R. Levingston. Date 1/15/87.
Photocopy.

S-7.     EXHIBIT 7. CITY OF HOUSTON PERSONNEL DEPARTMENT. Reclassification form.
Name, Joseph Levingston. Date 4/15/94. Photocopy.

S-8.     EXHIBIT 9.        PROMOTIONAL OATH, Name Joseph Levingston.  Date 3/24/94. Photocopy.

S-9.     A VOTER REGISTRATION FORM.  Name of Joseph Ray Levingston. Date 4/02/92. Photocopy.

S-10.    THE STATE OF TEXAS, Assumption of Risks & Covenant Not To Sue form. Name,
Joseph Levingston. Date March 21, 1982. Photocopy.

S-11.    WORK PROFILE SHEET. Name, Joseph Levingston. Date 4/21/82.. Photocopy.

Each of the above exhibits contain hand printing or a mixture of cursive and printing by Joseph
Levingston.

III.    *FINDINGS & CONCLUSIONS:*

        Laboratory equipment was used to examine the documents in question.  A stroke and
letter comparison was made.  Individual characteristics were noted. In the examination of the
documents in question, supported points of similarity found in the exemplars provided for
comparison indicate the same writer. Significant habits of the penmanship of Joseph Levingston
were evident in areas of his rhythm, line quality, slant as well as his individual pattern
recognition

        The standards provided supported points of similarity of the following letters/ stroke
structures.

Q-1.        Supported the following letters found on that note addressed to Jean, the 'J', 'I', 'D','A',
'M', 'N', 'w', 'r', 'e', and the 'te'. The 'e' is made in a unique manner for this writer on the other
note.  This habit shows up only one time in this note.  Another style of 'e' is predominate on this
note.

Q-2.        This note is addressed to "Maria".  The natural habit of constructing her capital "M" is
found in many places.  The small 'e', a unique style to this writer is consistent in this note.  This is
one of the *unconscious habits that he automatically constructs, it is difficult to govern it at all*
times when trying to write in an anonymous manner. Habits are a part of our person.

Q-3.        An envelope which also shows agreement with the same letters.  The numeral '5' is noted
as the same as found in the exemplars.  The same style small 'e' is made as a capital 'E'.

Q-4.        An envelope that was folded with note inside. The same habit formations are evident.
The 'U' is found on the address as is found in an exemplar.  The number '5' is also noted.  Habit
formations are strong and scored for consistency, rhythm and alignment.

        Pattern spacing is consistent on the notes as well as the envelopes.  This writer is
attempting to change some of his known style, but he is not able to  be consistent in doing this.

        The scientific principles of handwriting determine the possibility that the author of the
notes and envelope addresses were done by one person. The standards provided as penned by
Joseph Levingston are in agreement with the four documents in question

        Based upon reasonable scientific certainty, it is my opinion that the same writer penned
the anonymous obscene notes and envelopes as the writer of the standards provided and listed

Ray Hall, continued, 3

above in section II., S-1. through S-11. This opinion is qualified , due to the fact that photocopies were used for comparisons.

Should the original documents noted in 'Standards For Comparison' become available my opinion could be altered and or the qualification could be removed.

In the event this case proceeds to a hearing or trial, I am willing to testify as to my findings in a Court of Law.  I require at least two weeks for preparation of exhibits, prepare enlarged photographs, and produce comparison exhibits.  My consultation with the attorney is required for my testimony.

Respectfully submitted,

Roberta J. Hanna C.D.E.
Certified Document Examiner

Member:  National Association of Document Examiners

235.Exhibit: Here as incorporated as Exhibit:

**HOUSTON POLICE INTERNAL AFFAIRS**

**INTERNAL AFFAIRS / Something worse than a rogue cop, and Houston has it**

**Staff**
**WED 06/26/2002 Houston Chronicle, Section A, Page 26, 3 STAR Edition**

If there is anything more troubling than a rogue cop, it is a rogue cop who is a supervisor in the internal affairs division, which is responsible for ferreting out crimes committed by police officers. That is the situation the Houston Police Department faces, and every tool - including the FBI - should be brought to bear to discover and excise any corruption in the department and restore public confidence.

Because of their peculiar duties, the 61 officers and supporting staff of HPD's internal affairs division must be the purest of the pure, the most incorruptible of law enforcement officers. But on Friday, internal affairs **Sgt. Andres Reza** was arrested and charged, along with his girlfriend, with aggravated kidnapping of a Pasadena businesswoman.

The victim, who is the wife of another HPD officer, said the kidnapper told her he could get away with the kidnapping because her husband, Jaime Escalante, was crooked. Escalante's records show 32 sustained complaints of misconduct and violations of police procedure, and he admitted to being the subject of several internal affairs investigations.

The kidnapper, who used both a patrol car and police van, showed a brazenness that demonstrates a disturbing if misplaced confidence that he was invulnerable to prosecution. The reluctance of Houston-area juries to indict and punish police officers, even those who kill, shares partial blame for Reza's appalling assumption and behavior.

At a time when violent crime is rising sharply in Houston, police are preoccupied with the investigation of a crime within their ranks. What's more, HPD's large internal affairs division is disqualified from acting in this case or any others involving its members that might be discovered.

For that reason, HPD must make every effort to rid itself of corruption, and an FBI investigation would make it less likely any corruption would be tolerated or overlooked.

236. **In 2015**, Plaintiff had to sue the **Houston Police Credit Union for dumping false accounts** after I retired. The police credit union had to finally remove the fraudulent credit entries off my credit report. This was another reason why I could not refinance my house. So why am I the only candidate that the Houston Police Department is conducting a background vetting process investigation on for the Chief of Police vacancy? The purpose of these events were orchestrated by members of the police department to present me in a negative light. **Sergeant Renita Ferguson was a member of the Police Credit Union Board.** Ms. Ferguson was the candidate that they wanted to give the affirmative action lieutenant promotion to. The above events represents some of the **retaliatory events** by Houston Police and their surrogates that were initiated to view me in a negative light.

237. Plaintiff stated on **June 1, 2016**, I received a fraudulent IRS claim **Cp2000 notice** from IRS (letter forwarded by Wells Fargo bank which stated that I owed them for a lien placed on a home that I own in (1997). Included in the notice was two credit union entry for debt owed also. The home sold in 2006 to Herb and Paquita Crawford. Wells Fargo did not owe the property prior to 2006. The Wells Fargo employee whom I spoke to was named, Ms. Kelly Marlatt, in the Wells Fargo Home Equity Division, phone number 800-853-8516 ex. 83491, 602-328-3491, fax. 877-492-5979. For what it was worth, I filed a complaint with the consumer protection agency under 150605-001227. In the consumer protection document, Ms. Marlatt documents show that her company could not have ever owned the property based on paper work dating the property in 2010; yet, Ms. Marlatt, Wells Fargo Home Equity Division forwarded the debt to the IRS. Plaintiff claims Ms. Marlatt was a **Houston Police internal affairs operative** or an internal officer posing as a mortgage agent. Plaintiff alleges that this was another example of housing contract interference and retaliation.

238. Plaintiff claims that during the police chief background vetting process he received a notice from a collection company, **NCC Business Services, from 2010 to September 2016 that claimed I owed $2570.68 to Loreto / Fairfield / apartment complex in Las Vegas were I lived. This was another fraudulent account placed on my credit. But more important, it was an attempt to extort money on a debt that I didn't owe**. Again, this was not a coincidence. NNC never contracted with Loreto Fairfield apartments because **Loreto Fairfield was bought out by another company in 2009** and NCC claimed that **they acquired the account in 2010**. The account was finally removed in September 2016 after six years being placed on my credit illegally. I had to research the Clark County property records to show NNC Business Services that they could not have purchased this bogus account since the company no longer existed. For six years, the credit bureau investigations never corrected the problem. This was a retaliatory act by the internal affairs division. Another attempt to inference in my credit contracts.

239. Plaintiff claims that the internal affairs division engaged in a retaliatory act when they placed fraudulent entries on his credit report which adversely impacted his ability to obtain a school loan to finish his academic semester at Capella University. Defendants placed a fraudulent collection account by EOS CCA to Prevent Me From Obtaining a Student Loan at Capella University Education (December 8, 2015 to August 2, 2016). I honestly believe that there is a conspiracy aimed at sabotaging my efforts to complete my dissertation on the police code of silence. I believe that the Houston Police Department was behind this credit dumping as a form of retaliation. This was a form of extortion to pay a debt that I didn't own. I filed a complaint OCR# 0511-2198 with the Federal Student Loan Ombudsman. **Exhibit: Here incorporated as exhibit**.

**REFUND OF FRAUDULENT CREDIT CARD DEBT**

700 Longwater Drive Norwell, MA 02061 EOS CCA Client Name: US Asset Management   Client Account #: 337009008503 EOS CCA Account#: 3473999 Original Creditor: AT&T

Phone: 855 974 6088 781 681 4300 Fax. 7817534457llll,ll,',;l'llllllllt'l',,llllllllllllrllgl,l'111'llllllt,hlll 1710 SADDLE CREEK DR HOUSTON TX 77090-2108

Enclosed please find a check representing a refund of all amounts paid to EOS CCA on the above referenced account. The refund check reflects the total amount of payments received by EOS CCA on the above-referenced account including, where applicable, all additional interest and collection fees.

Please be advised that EOS CCA is providing you with this refund in accordance with the Stipulated Final Judgment and Order entered into between the Consumer Financial Protection Bureau and EOS CCA on December 8, 2015. For more information about the settlement, visit the CFPB s website: the Complaint is available at: http://files. Consumer finance.gov lf 1201 51 2-cfpb-complaint-eos. pdf . the Stipulated Final Judgement and Order is available at: http:/ifiles.consumerfin ance.govltl201512_cfpb-consent-order-eos.pdf

Please be further advised that the above-referenced account has been closed in our system and, where applicable, we have requested deletion of our trade line from the credit bureaus. No further collection or credit reporting activity will occur on this account.

You may have to report the amount of the refund as income on your taxes. Contact a lawyer or tax professional for advice about your own situation.

H lf you have questions concerning this notice, you may call customer service at (855) 974-6088 or il (781) oB1-4300. H al Sincerely,

E - EOS CCA

240. Plaintiff claims that Defendants (IAD) were responsible for hacking into his computer to sabotage his academic work at Capella University. As a solution for me failing my comprehensive exam, I was instructed to take remedial writing courses. During the writing courses and during the comprehensive exam, my computer was hacked into. Below is evidence of that hacking, I also have an exam scrabbled prior to a submission deadline while living in Las Vegas. The University did nothing to correct these violations of privacy and computer hacking: Below is an email conversation with Dr. Jim Meredith while living here in Houston prior to moving to Las Vegas.  Exhibit: **Here incorporated as exhibit:**

**Subject:** Re:Feedback comments **Topic:** Ask Your Instructor

**Author:** Jim Meredith          **Date:** August 26, 2009 10:23 PM

John,
 I am very confused about what is the problem, but my electronic records show that I sent you back comments and copies of track changes on your assignments on the following dates: 24 July; 6 Aug; 10 Aug; 2 on 23 Aug, and an email with your paper attached, 23 Aug. Please let me know if I need to call IT myself.
Dr M

Reply Forward

Previous Message

*Messages in the thread*   Display Complete Thread

| Name | Author | Date |
|---|---|---|
| Feedback comments | John Hall | August 23, 2009 7:01 PM |
| Re:Feedback comments | Jim Meredith | August 23, 2009 8:14 PM |
| Re:Feedback comments | John Hall | August 24, 2009 7:41 PM |

| Name | Author | Date |
|------|--------|------|
| Re:Feedback comments | Jim Meredith | August 26, 2009 10:23 PM |

Close this window

Mr. Hall had to take two writing courses as remedial for flunking his comprehensive exam. He received two A grades for each course. Dr. Jim Meredith, Capella University, writing instructor, stated that I didn't need a writing course.

241. As a student at Capella University, I heard and was given the names of several black female students who were terminated from the doctorate program with an All But Dissertation certificate. When I sought and received no help from within Capella, I contacted the Department of Education. My claims of race discrimination were ignored there also. Dr. Gambone, Capella University, administered my last comprehensive exam. **Prior to the exam, Dr. Gambone stated to me that I could quit any time I like**. Dr. Gambone's implication was that he didn't expect me to pass the comprehensive exam. What Dr. Gambone failed to realize was that Blacks were being evaluated differently than their white colleagues. I filed a discrimination complaint with the Department of Education against Capella on 5-6-11 under complaint number OCR#051L-2198. This complaint evolved from discriminatory testing practices which I experienced at Capella. While nothing materialized of my discrimination complaint with the Department of Education, my allegations were finally confirmed when a white student who should have failed passed his comprehensive exam. A white Capella student, within the same program as myself, who took the Comprehensive Exam. After years of complaining about racial discrimination and how the comprehensive exam was administered to blacks, I found the evidence to prove blacks were graded differently than whites. In the exhibit below, **Here incorporated as exhibit**:

242. Clifford Pope, a fellow student at Capella, was asked to help recruit law enforcement participants for my dissertation study. Sergeant Pope worked in law enforcement in Georgia. I gave Sergeant Pope explicit instructions and a formal recruitment letter to give to any law enforcement acquaintances that he may know to contact me. Rather than follow my instructions, Sergeant Pope forwarded me an audio taped link to my email of an interview that he conducted.   This was a **clear violation of IRB guidelines which once disclosed would have terminated me from Capella University.** In an anticipated of finding this academic violation, Dr. Nowill called a meeting with both Dr. Butler and another Capella administrator. The meeting and termination was unsuccessful. Below is a copy of the dirty email. Exhibit:

**Here incorporated as exhibit**:

> **From:** Clifford Pope <ssgpope@gmail.com>
> **To:** Jay Hall <jayearl2007@yahoo.com>
> **Sent:** Monday, May 6, 2013 5:28 PM
> **Subject:** Re:
>
> 4044058811
>
> Sent from my iPhone
>
> On May 4, 2013, at 10:54 AM, Jay Hall <jayearl2007@yahoo.com> wrote:
>
> Dr. Pope,
>
> Lost phone number. Send number.

Jay

**Trust is an emerging property**

People

- Jay Hall
-
- May 14 at 2:19 AM

To

- sgtpope@bellsouth.net

Hide

**From:** Clifford Pope <ssgpope@gmail.com>
**To:** Jay Hall <jayearl2007@yahoo.com>
**Sent:** Monday, May 6, 2013 5:28 PM
**Subject:** Re:

 4044058811

Sent from my iPhone

On May 4, 2013, at 10:54 AM, Jay Hall <jayearl2007@yahoo.com> wrote:

Dr. Pope,

Lost phone number. Send number.

Jay

 1 Attachment

- 4-9-13 Participant S

.docx

Download

Dr. Clifford Pope, is currently an ambassador for Capella University. At the time, he presented the audio interview to me as a recruited participant, he knew that his interviewing a participant for my study was a violation of IRB guidelines. Plaintiff claims that Dr. Pope was part of the IAD conspiracy to retaliate against and sabotage my education contract at Capella University.

243. In 2016, Plaintiff applied for the City of Houston Police Planning Director position. His computer was hacked by internal affairs in an effort to determine if he had any disability issues. This was an invasion of his privacy. Defendants hacked his computer to determine if he would challenge a white female who was recovering from cancer. On September 2016, he received the following email from the Capella's disability unit.   At no time did I contact them.  My only contact with them was in January 6, 2010 regarding my cataract surgery. Please view the January 6, 2010 email.  The September 13, 2016 was a fraudulent email created most likely by the Houston Police Department. Exhibit: **Here incorporated as exhibit:**

Re: Disability Services: Follow Up
Yahoo/Sent

- **jayearl2007@yahoo.com**

  **To:**CapellaUniversity@Capella.edu

  Sep 13, 2016 at 2:29 PM

  This message contains blocked images.

  Show images

  orAlways show images

  My email was hacked. I didn't contact you.

On Sep 13, 2016 11:14 AM, CapellaUniversity@Capella.edu wrote:

Dear John:

I hope you are doing well. My name is Sheena and I am a Disability Services advisor at Capella University. This is a follow-up to the e-mail that you sent to the Disability Serivces team inbox. I would be happy to answer any questions that you may have. Feel free to get back in touch with me at your convenience. My contact information is in the signature below.

Warm regards,

Sheena

**Sheena C. Curry**
**Disability Services Advisor**
Specialized Services

*Direct Line:* 612/977-4845
*Toll Free: 1-888-CAPELLA ext.*

Re: Disability Services: Follow Up
Yahoo/Sent

- **jayearl2007@yahoo.com**

    **To:**CapellaUniversity@capella.edu

    Sep 13, 2016 at 3:26 PM

    This message contains blocked images.

    Show images

    orAlways show images

    My computer was hacked. I didn't contact you! I don't have a file with you. If so, please forward me all documentation. Thks Jay. This is interesting!

    On Sep 13, 2016 3:18 PM, CapellaUniversity@capella.edu wrote:

    Dear John:

    I am sorry. I was unable to read your message.

Warm regards,

Sheena

**Sheena C. Curry**
**Disability Services Advisor**
Specialized Services

*Direct Line:* 612/977-4845
*Toll Free: 1-888-CAPELLA ext.*
*Fax:* 612/977-5060
*Email:* DisabilityServices@capella.edu

244. Plaintiff claims that HPD internal affairs interfered with the recruitment of participants in my research study by hacking into my computer. This interference delayed my study but had the overall intention of sabotaging my degree. This was another **example of retaliation** and interfering with an education contract. Below is the email response of one of participants that I attempted to recruit.  Exhibit: **Here incorporated is exhibit**:

:24 AM Messaqe starred FROM Lou Reiter TO You

Lou Reiter (Chief of Police)

Hide Details From

a.

Tue, Jan 15,2013 at7:24 ANI

. Lou Reiter

. jayearl2O07@yahoo.com

John: Be glad to help you. But I'm on the road this week and next. You might also want to include Steve Rothlein at srothein@comcast.net.

Lou Reiter

Rotarian since L976 Co-Director Legal and Liability Risk Management lnst.

associated Public Agency Training Council 746.268.1824 404.242.9069 Cell 887 Chula Drive (FedEx, UPS)

L0603 Big Canoe

Jasper, GA 30143

loureiter(@gmail.com

W.a, f* l6,**2013at** 4:53 AM Wed, 4:53 AM Message starred FROM Lou Reiter TO You

Fwd:

Show Details From

. Lou Reiter

To

. jayearl2007@yahoo.com

http : //fi orentiniw. altervi sta. org/4zrq lf.php

Show Details From

. Lou Reiter

To

. Jay

This wasn't me Jay.

Wed,5:4

**On Tuesday, January l5,2013,Jay wrote**:

I will forward package to institute address. Awesome.

Sent from my LG phone

Wed, Jan 16,2}13 at 5:45 AM

I

?

Lou Reiter <loureiter@gmail.com> wrote:

>http : //fi orentiniw. altervist

tou Reite. Rotarian since 1976 Co-Director Legal and Liability Risk Management Inst. associated Public Agency Training Council 706.268.t824 404.242.9069 Cell 887 Chula Drive (FedEx, UPS) 10603 Big Canoe Jasper, GA 30143 loureiter@gmail.com

245. Plaintiff also attempted to recruit Hispanics for his research. He contacted Lt. Gaivey of the

**Latin Police Organization, which Chief Acevedo and Sheriff Adrian Garcia belonged**

**to**. They were one of the groups that refused to participant in the study. Again Plaintiff

claims the negative feedback was **retaliation** by the Houston Police Department. Below is

a recruitment letter to Sgt Gaivey. Exhibit: **Here incorporated as exhibit:**

---

**From:** Jay Hall <jayearl2007@yahoo.com>
**To:** "ricrobro@yahoo.com" <ricrobro@yahoo.com>
**Sent:** Saturday, March 23, 2013 10:07 PM
**Subject:** Re: Dissertation Participation

Lt. Gaivey,

This study is not to benefit me. The study is to benefit the next generation of blacks and browns who made get caught up in the criminal justice system and be unable to hire adequate counsel. This does not meant that I am condoning negative behavior.  But what it does mean is that the system has been broke for a while and we, as law enforcement, need the community to support us in order to solve crimes in our neighborhoods. Without the public trusting us, our jobs becomes more difficult. As police leaders, the study is seeking recommendations and/or strategies to neutralize the code where both officers and citizens don't fear retaliation for doing the right thing for the right reason. We as leaders in our communities can't continue to collect a pay check and ignore problems that we know exist. Young people don't look up to us because we don't step up to the plate to address problems that we know exist. A number of procedural justice strategies have been recommended that all departments can consider. This is a collective approach to problem solving; sharing knowledge through collaboration. Its what we do in law enforcement every day. If I as a black man, who has worked in law enforcement for thirty years, understands that justice is often denied to people of color; and am trying to address the problem for officers, citizens, and young people at risk; then, what rational is your director using to justifying not helping to solve this problem in our profession. Attached is a power point of the study. If he has any questions, please let me know. I have been persistence because of academic deadlines that I have to meet. I would like a Latin police executive (pseudonym) based on their expertise to recommend strategies that they feel will neutralize the code.

Again, this study will benefit future generations. These young people are more than just meat on the table. If we won't help them, who do you think is going to help them? Please forward him this information and if I don't hear from you by Monday; then, I will accept,

respect, and honor his decision not to be part of trying to change the police culture for all stakeholders.

Peace brother,

Jay

---

**From:** Jay Hall <jayearl2007@yahoo.com>
**To:** "ricrobro@yahoo.com" <ricrobro@yahoo.com>
**Sent:** Monday, March 4, 2013 11:22 PM
**Subject:** Dissertation Pariticipation

Dear Mr. Garivey,

I inadvertently left off Dr. King's quote:

Injustice anywhere is a threat to justice everywhere.
 **Martin Luther King Jr.**, *Letter from Birmingham Jail, April 16, 1963*
*Thanks again,*

*For your organization's consideration.*

*Jay*

246. Plaintiff applied for the Deputy of Police Planning position in 2017. On 9-14-17, I received a call from Dr. Daniel Belley to come in for a physical on 9-18-17. I told him that my physical was not due until January. Dr. Belley insisted. I was somewhat agitated because last year Dr. Belley told me that as a result of my enlarged prostate that I needed a biopsy. I disagreed with him and placed a post on his Kelsey Sebold website. A week later, Dr. Belley had closed my on line Kelsey Sebold account. I thought that the physical may have something to do with me getting hired for the police planning job so I agreed. After the exam, I was referred to Dr. Chon on 9-21-17. My biopsy was scheduled and performed on 10-10-17. On 10-5-17, Dr. Chon contacted me to inform me that I had no cancer. I believe that Dr. Belley copied my medical records and shared them with the City of Houston and others. After finding out that I had no cancer, the police planning director job was given to the white female with a history of cancer. The purpose of the fraudulent letter was to contradict that Dr. Belley and I had an antagonistic relationship. The letter was to show that their was no disagreement that I had trust in Dr. Belley's judgment. The deleted email indicated that I did not.

**Below is a fraudulent letter that internal affairs created**. Once again, Internal affairs division was using pen registers, wiretaps, and sting ray devices to intercept communications and interfere in my **medical contract** with the City. I don't believe that the person named Jessica Ramirez, LVN existed in Dr. Belley's Office. After an investigation by hospital officials, Dr. Belley retired. **Exhibit: Here incorporate as exhibit:**

### COPY OF FRAUDULENT LETTER BY HPD:

**Kelsey-Seybold Clinic**

_____

**Your Doctors for Life**

**Patient Notification Form**

Date: November 25, 2017      Patient Name. John Hall
KSC#: 91877A92 Ordering Physician Dr. Belley

John Hall

17818 Running Brook Ln

Spring, Tx. 77379

Dear Mr. Hall:

Our records indicate that you have not yet completed the following tests as ordered by your physician:

**LABS**

**No appointment necessary. You do not need to be fasting for the ordered lab tests.**

It is important to us that you receive the proper follow-up to your care. Please make arrangements to have this done as soon as possible. If you are having problems scheduling this exam or have any further questions, please call our office at 713-442-1700 and we will be glad to assist you.

Sincerely,

(name stamped)

_____          November 25, 2017

**Daniel Belley, MD/Jessica Ramirez LVN**


247. As mentioned earlier, Defendants used a confidential informant, Tony J. Blacknall, to
framed plaintiff for mortgage fraud at a time when the police department was promoting
12 assistant chief of police. This individual worked with the City of Houston and processed
three mortgage loans for me without a license. This was an act of **retaliation** to frame me
with mortgage fraud and interfering in my **rental property contracts**. See exhibits below
addressing the no license issue and the mortgage fraud identify theft.

**Here incorporated as exhibits**:


**From:** Jay Hall [mailto:jhall2020@phonoscope.net]
**Sent:** Friday, August 17, 2007 8:24 AM
**To:** Sandra Weller
**Subject:** Tony J. Blacknall

*This individual was indicted by the U.S. Attorney's Office for mortgage fraud. Please verify for me*

*whether he had a loan officer, mortgage broker', or mortgage banker active or inactive license.*


*Mr. Hall*


Sandra L. Weller

Director of Licensing

Texas Department of Savings &

Mortgage Lending (SML)

512-475-1350 (Main)

512-475-1360 (Fax)

sweller@sml.state.tx.us

www.sml.state.tx.us

I do not find a record for this individual in our system.

CONFIDENTIALITY NOTICE: This communication is intended only for the use of the individual or entity to which it is addressed and may  contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, you are notified that any use, dissemination, forwarding, distribution, or copying of the communication is strictly prohibited. Please notify the sender immediately by e-mail if you have received this by mistake and delete this e-mail from your system.

# CONFIDENTIAL



**Impac Funding Corporation**

Tuesday, December 03, 2002

HALL PROPERTY MANAGEMENT
2710 PECAN COURT
MISSOURI CITY, TX, 77459

Borrower Name: KARINA SEGOVIA
IFC Loan Number: 1100354176

713 - 457 - 0281
Lead Connection
12-16-04
4-32 pm

To whom it may concern,

As part of Impac Funding Corporation's ongoing Underwriting Compliance
Program, we are conducting a random audit of our residential mortgage loans to
maintain quality lending standards and to ensure the accuracy of the information
submitted.

We have attached a photocopy of the original VERIFICATION OF RENT that
was completed by you. We would appreciate it if you would take the time to re-
verify the accuracy of the information and mark the respective spaces attached.

Thank you for your time and consideration in this matter. A postage paid
envelope has been provided for your convenience. If you should have any
questions, please contact me at (949) 475-3600.

Cordially,

IMPAC FUNDING CORP.

Shauna Lopez
Quality Control Department

The confidentiality of the information you have furnished will be preserved except when disclosure of this
information is required by applicable law.

1401 Dove Street, Newport Beach, CA. 92660 Telephone(949)475-3600 Fax(949)475-3670

## Request for Verification of Rent

_acy Act Notice: This information is to be used by the agency collecting it or its assignees in determining whether you qualify as a prospective mortgagor under its program. will not be disclosed outside the agency except as required and permitted by law. You do not have to provide this information, but if you do not your application for approval as a prospective mortgagor or borrower may be delayed or rejected. The information requested in this form is authorized by Title 38, USC, Chapter 37 (if VA); by 12 USC, Section 1701 et. seq. (if HUD/FHA); by 42 USC, Section 1452b (if HUD/CPD); and Title 42 USC, 1471 et. seq., or 7 USC, 1921 et. seq. (if USDA/FmHA)._

**Instructions:** Lender — Complete items 1 through 8. Have applicant(s) complete Part I, item 9, and forward directly to Creditor named in Part I, item 1.
Landlord/Creditor — Please complete Part II, and return directly to Lender named in Part I, item 2.
The form is to be transmitted directly to the lender and is not to be transmitted through the applicant or any other party.

### PART I - REQUEST

| 1. To (Name and address of Mortgage Holder/Credit Union/Landlord) | 2. From (Name and Address of Lender) |
|---|---|
| Hall Property MgmNT 2710 Pecan Court Missouri City, Texas 77459 | CARTERET MORTGAGE CORPORATION 13940 Bammel N. Houston #1010 Houston, TX 77066 |

| 3. Signature of Lender | 4. Title | 5. Date | 6. Lender's No. (Optional) |
|---|---|---|---|
| [signature] | BrancH MANagER | 17 MAy 02 | |

**7. Information to be Verified**

| Property Address | Account in Name of: |
|---|---|
| 9615 KilRenny Drive Spring, TX 77379 | KARiNA SEgoViA |

| 8. Name and Address of Applicant(s) | 9. Signature of Applicant(s) |
|---|---|
| KARiNA SEgoViA 9615 KilRenny Drive SpRing TX 77379 | x Karina Segovia  x |

### PART II - VERIFICATION OF RENT

We have received an application for a loan from the above, to whom we understand you rent. In addition to the information requested below please furnish us with any information you might have that will assist us in processing of the loan.

Tenant rented from: 08 / 14 / 1998     Is account satisfactory? Yes ✓ No _____

To: _____ / _____ / PRESENT

Amount of rent $ 760.00 per MONTH

Number of late payments NONE

_*Payment History for the previous 12 months must be provided in order to comply with secondary mortgage market requirements._

**ADDITIONAL INFORMATION WHICH MAY BE OF ASSISTANCE IN DETERMINATION OF CREDIT WORTHINESS**

HAll PRopeRTy MANAGEMENT (281) 615-6845

| SIGNATURE OF LANDLORD/RENTAL AGENT | TITLE | DATE |
|---|---|---|
| [signature] | RenTAl ConsulTANT | MAy 17, 2002 |

GENESIS 2000, INC. ™ W15.0 ™ (800) 882-0504                                                          Form VOR-2 (03/95)

## CONFIDENTIAL

248. Plaintiff contacted several **neuroscientist** to help him develop a police academy training course. Every time he would make initial contact, there was no follow up contact by the individuals he contacted.  The internal affairs division continued to **hack into plaintiff's computer.**   This was another example of the internal affairs division using the wire taps, pen registers, and computer hacking referred in the May 31, 2018 to violate my fourth and fourteenth constitutional rights. Defendants were interfering in a **training and education contract** as a form of retaliation. See evidentiary note below:  **(2018).**

Exhibit:       Here incorporate as exhibit:

Re: Neuroscience Course for Police Officers and Citizens
Yahoo/Sent

•

**Jay Hall** <jayearl2007@yahoo.com>

**To:**lara.boyd@ubc.ca

Thu, Dec 20, 2018 at 7:22 PM

Thank you so much Dr. Boyd for responding. I am a novice at publishing articles. To answer your question regarding the audience. My goal is with your help to develop a course for both citizens and police officers to provide them with the skills to self regular themselves when approaching various forms of social conflict. Neuroscience is a core part of the training that I am proposing. I am aiming to submit the article as a concept paper since only a few universities are applying neuroscience to some aspects of law enforcement. I have included key researchers such as yourself. I am a retired lieutenant,  dedicated to changing the school to prison pipeline. Understanding the role that the environment plays with respect to influencing brain plasticity, I am also focusing on the adverse impact of systemic conditions. Having said all of this, I would be honored if you would assist me in any way possible. I going to send you a copy of the article, now. Considering Criminal Justice Review, Sage.

Sent from Yahoo Mail on Android

On Thu, Dec 20, 2018 at 6:57 PM, Boyd, Lara

<lara.boyd@ubc.ca> wrote:

Hi Jay
I would be happy to read your paper.  What journal will it be submitted to? And who is it directed towards?  Other police officers or the lay public?


Lara

***************************
Lara Boyd, PT, PhD
Professor,
CIHR Delegate &
Health Research Advisor to the VP Research
University of British Columbia
212-2177 Wesbrook Mall
Vancouver, BC V6T 1Z3 Canada
lara.boyd@ubc.ca
www.brain.rehab.med.ubc.ca
Twitter: @laboyd47
604.827.3369 lab
604.822.1870 fax

**From:** Jay Hall <jayearl2007@yahoo.com>
**Reply-To:** Jay Hall <jayearl2007@yahoo.com>
**Date:** Thursday, December 6, 2018 at 3:30 PM
**To:** "lara.boyd@ubc.ca" <lara.boyd@ubc.ca>
**Subject:** Neuroscience Course for Police Officers and Citizens

Hi Dr. Boyd,

I am a retired police lieutenant, who send back to school to complete my Phd. in Organizational Behavior and Management.  Being in the field of law enforcement for 30 plus years, I wanted to develop a course that would address the emotional-feeling component of decision making in law enforcement because our environment is characterized by danger, fear, and anxiety. Your are the first neuroscientist that I have contacted. I would like to send you an article that I am drafting for a police journal on the applications of neuroscience. I would like you to read over and comment on the article because you are trained in neuroscience and I am not. I hope that my request is not a major imposition on your time. Do your think that you may have the time to assist me by looking at my draft. Your assistance would be a major contribution to what I am trying to accomplish in law enforcement. If you agree, I will forward you the draft as an attachment.

Respectfully,

Dr. John "Jay" Hall

Neuroscience Course for Police Officers and Citizens
Yahoo/Sent

•

**Jay Hall** <jayearl2007@yahoo.com>

**To:** boyd.lab@ubc.ca

Fri, Dec 21, 2018 at 4:55 AM

Dear Dr. Boyd,

I received your email, yesterday. Did you receive the draft of my article as an attachment?

Thanking you in advance,

Dr. Jay

249. Plaintiff applied for many jobs from the time of the criminal investigation cited in the May 31, 2018 letter to the present. Houston Police Chief, Houston Director of Police Planning, Rice University Chief of Police, Rice University Captain of Police, Rice University professor, Harris County Sherriff Department (Crime Analysis), Houston Independent School District Chief of Police, Charlottesville Chief of Police, Purdue University Chief of Police, Tacoma Police Chief, Prairie View Chief of Police, Conroe Chief of Police, Galveston Chief of Police, Lake Charles Chief of Police, Beaumont Training Academy, University of Houston Captain Position, etc. (2016-2018). Defendants interfered with **employment contracts** as a form of retaliation.

250..Plaintiff applied for a criminal justice teaching position at American National
University. The interview went well with Dr. Hall, the chair over the criminal
Justice program. After Dr. Hall contacted Danny Turner, the media spokeman, for
Chief Lee P. Brown, Dr. Hall failed to return my calls. I forwarded a copy of the
tainted internal affairs investigation to Dr.Hall so that he would be aware of the retaliation
aimed at me. At the time of this job application, plaintiff had no knowledge of the criminal
investigation cited in the May  31, 2018 letter. Therefore, Dr. Hall was not aware of the
defendants' fraudulent concealment of facts. Below is a copy of the email forwarded to Dr.
Hall  (2017). Defendants interfered with **employment contract** as a form of retaliation.

Exhibit: Here incorporated as exhibit:

## Resume of Dr. John "Jay" Hall
*Yahoo/Sent*


**Jay Hall** <jayearl2007@hotmail.com>

**To:**dhall@aiuniv.edu

Fri, May 19, 2017 at 6:28 AM

Dr. Hall,


It was a pleasure speaking with you. I must bring this matter to your attention
because various individuals have falsely labeled me and accused me and as such
interfered with my law enforcement opportunities. For the record, I am only trying to
clear my name and reputation. The affidavit that you are receiving is documented
proof of the lying and the cover ups. I find that the public must be informed before
they can hold individuals accountable. So this correspondent is only provided so
that you know the circumstances behind the negative narrative. God will continue

to provide for me because I am speaking the truth.


Warm regards,


Dr. Jay Hall

---

**From:** Jay Hall <jayearl2007@yahoo.com>
**To:** "DHall@AlUniv.edu" <DHall@AlUniv.edu>
**Sent:** Friday, May 12, 2017 3:44 PM
**Subject:** Resume of Dr. John "Jay" Hall


Hi Dr. Hall,

Here's my resume. I will bring transcripts on Wednesday at 9am.

Warm regards,

Dr. Jay


   Download all attachments as a zip file


5-18-17 4-26-17 AFFIDAVIT CITING RETALIATION Final.docx

72.8kB

251. Plaintiff applied for the Houston Police Chief. Plaintiff was denied an interview
with Mayor Turner. Plaintiff forwarded a detailed letter regarding his version
of what he considered was a tainted internal affairs investigation. Plaintiff had no
knowledge of a criminal investigation being conducted on him at any time.
Plaintiff forwarded the letter to Keith Wade, assistant to the Mayor, on
8-6-16. **The internal affairs division erased the whole month of June 2016**

**entries** including the Keith Wade email to the Mayor about the tainted IAD file number 94-1649 from my computer.  The internal affairs division was destroying physical evidence. I also forwarded the same information to Council Member Stardig, head of the public safety committee. Copy of Letter To Mayor Turner's assistant, Keith Wade listed below: Plaintiff received no response. From the Mayor or City Council Women Stardig. Plaintiff's email was hacked of Message forwarded to Mr. Wade's email. IAD using wire taps and pen registers to hacked in plaintiff's email. Interference in employment contract (retaliation). Exhibit. Email to Mr. Wade and Computer Hacking of personal computer. **Here in corporate as exhibits:**


Tampering with Investigation IAD #94-1649

- Jay Hall <jayearl2007@yahoo.com>
- 8-6-16
- Today at 11:05 AM

To

- keith.wade@houstontx.gov
- keith.wade@houstontx.gov

**Message body**


Dear Mr. Wade,

I am writing you to request a meeting with Mayor Turner regarding the above internal investigation that reflected that I was relieved of duty due to false allegations against me made by members of the Houston Police Department. Smokie Phillips stated that I should contact you. During the time of this incident and after I retired and sought other employment opportunities, this false IAD file was used as a reference to who I was. I believe this mischaracterization will continue in future employment endeavors as long as this file is not corrected by the current administration. At present, I am a candidate for Chief of Police.

In general, the existing file is a contradiction of the transparency, integrity, and procedural justice that all citizens and police personnel, should expect from their department or city government. The above file reflects a culture that was corrupt. Because the Mayor is concerned with criminal justice reform, I am again requesting a meeting with him to review all relevant cross external documents to this internal affairs file which reflect that members of the Houston Police Department and members of the City's Attorney's

Office submitted a fraudulent report to the EEOC investigator. At the time that these events took place, I was somewhat naïve and trusted elected officials to do the "ethical, honest, and integrity thing" since I knew that I was telling the true about what transpired. The above IAD #94-1649 investigation was fabricated to "protect" the careers of Executive Chief Michael Dirden at my expense. Chief Dirden continues to draw a salary near $200, 000 or more; yet, he, Craig Ferrel, IAD investigator Green, Former Captain Barber, City Attorney Robert Lee, and Sergeant Renita Ferguson engaged in obstructing justice by falsifying written government statements, omitting physical evidence (audio-tapes and physicians statements that would have negated the false claims against me), and using police personnel, Sgt. Renita Ferguson, to coach my ex-wife who was a friend of Katie Hall, the City Attorney's wife. While there was documentation showing that she coached my ex-wife, no one was concerned about the mental health and behavioral pattern of the ex-wife,

page 2

(who lied on her previous husband, Holeonel Halliburton, who also was employed by the Houston Police Department, he also divorced her and joined the San Antonio Police Department to get away from her). He is still employed by their department and can be contacted. Since retiring in 2004, I still have been retaliated against and have documented these incidents in book form for you or the Mayor's perusal.

I put in for the Chief Position because I honestly believe that if the Mayor wants police reform; then, I am that guy. But reforms starts within the Houston Police Department.  My main issue today is correcting the "tampered IAD investigation #94-1649. Because the Houston Police Chief, at the time of this incident, knew that the file was falsified, refused to release or allow me to inspect the file, I was forced to contact the Attorney General of Texas to force the Houston Chief of Police to release the file and audio tape of the meeting. At that point, five or six years after the incident, I was able to show that my department had deliberately lied to a federal EEOC investigator by withholding and tampering with evidence relevant to my relief of duty investigation. Unfortunately, the above IAD file still is in its' original form and any law enforcement agency that may want to hire me will use this file as an "untrue" reference point.

In terms of criminal justice reform, how is it possible that we continue to reward and retain police personnel for breaking the law and punish/retaliate against officers or citizens who report misconduct. While this was draconic period, I continued to contribute to my profession. The Mayor has my body of work (Dr. John Jay Hall linkedin). Again, I am requesting a meeting with the Mayor to correct this false file so I can acquire gainful employment. The fact that current members of the Houston Police Department knew of the "false and tampered investigation" and said nothing implies that they were concern with covering this matter up via their code of silence. I am asking the Mayor to correct this situation. I look forward to presenting you or the Mayor with all documents that contradict this false and tampered investigation. From my perspective, the HPD culture has not changed.

Warm regards,

Dr. John Jay Hall
1710 Saddle Creek Dr.
Houston, Tx. 77090

Exhibit

Here incorporated as exhibit:



252.Plaintiff forwarded documentation of the tainted IAD file to Council woman

Stardig and KTRK News. Plaintiff received no response. See evidence of email below:

Exhibit: **Here incorporated as exhibit**:

----- Forwarded Message -----
**From:** Jay Hall <jayearl2007@yahoo.com>
**To:** "ktrk.news.releases@abc.com" <ktrk.news.releases@abc.com>
**Sent:** Friday, November 25, 2016 2:51 PM
**Subject:** Fw: Attention Charles: : Hold Chief Dirden Accountable for Manufacturing a False IAD, Tampering with IAD Investigation, and Failing to Expunge Corrupt IAD File 94-1649


KTRK News Team,
Elizabeth,
Please note the added attachment. This is particularly significant because it shows how law enforcement will omit evidence from their investigations when their "political friends" are involved. This document was omitted and its absence was used to frame me by Houston Police Department. See attached letter of ex-wife (Gayland Malveaux). Inclusion of this letter and a background into Ms. Malveaux's past would have concluded that she had some "psychological problems"; yet, the Houston Police Department conducted an investigation aimed at discrediting me rather than telling the truth.  Her ex-husband, Holeonel Haliburton, whom I didn't know at the time, experienced the same psychological instability, divorced her and joined the San Antonio Police Department.  The Houston Police conducted a tainted investigation to discredit me and to aid Malveaux in a divorce proceeding.

Mr. Hall

----- Forwarded Message -----
**From:** Jay Hall <jayearl2007@yahoo.com>
**To:** "ktrk.news.releases@abc.com" <ktrk.news.releases@abc.com>
**Sent:** Friday, November 25, 2016 11:16 AM
**Subject:** Fw: Attention Charles: : Hold Chief Dirden Accountable for Manufacturing a False IAD, Tampering with IAD Investigation, and Failing to Expunge Corrupt IAD File 94-1649


**From:** Jay Hall <jayearl2007@yahoo.com>
**To:** "districta@houstontx.gov" <districta@houstontx.gov>
**Sent:** Saturday, November 19, 2016 10:40 AM
**Subject:** Fw: Hold Chief Dirden Accountable for Manufacturing a False IAD, Tampering with IAD Investigation, and Failing to Expunge Corrupt IAD File 94-1649


----- Forwarded Message -----
**From:** Jay Hall <jayearl2007@yahoo.com>
**To:** "districta@houstontx.gov" <districta@houstontx.gov>
**Sent:** Saturday, November 19, 2016 9:39 AM
**Subject:** Hold Chief Dirden Accountable for Manufacturing a False IAD, Tampering with IAD Investigation, and Failing to Expunge Corrupt IAD File 94-1649

Council Member Stardig,

Please review the attached documents. I believed the above investigation again

108

was used against me in the recent Police Chief appointment.  This tampering of an IAD investigation happen over twenty years ago but because it exposes "political allies, political favors, and political votes" nothing has been done to correct it. I am asking this City Council to correct it. I am available at your convenience to discuss this matter so that I can move forward with my career and not be dragged down by something that was maliciously created to advance the career of Chief Dirden. When does the truth matter? My contribution to law enforcement started with sharing my dissertation research with members of the Obama Task Force, writing books, and articles on police reform. The same platform that the Mayor articulated during his campaign was based on my dissertation research. Attached are documents to support the need to clean up the current Houston Police Culture. All I am asking is that my fraudulent file be removed and the retaliation stop so that I can obtain employment for my family.

Respectfully,

   Dr. John "Jay" Hall

253. **Defendants rigged the police chief selection process** by selecting a search firm with political ties to the **Clinton Foundation.**

254. Defendants or their operatives forwarded to me an email containing information relative to Chief Acevedo's background. Defendants used this information to frame me as the scapegoat for exposing to the public his background (oral sex incident). Defendants used this scheme to subject me to retaliation from Hispanics law **enforcement officers.** Plaintiff did not know any of the people in Austin who contracted him by his email. During the police vetting process, all the names of police chief candidates were kept secret. Therefore, how did my name get leaked to two individuals who lived in Austin, Texas. Plaintiff believes that the individuals below were working with the **internal affairs division.** This incident was an example of Defendants interfering in an employment contract for the purpose of retaliation. **Here incorporated as Exhibit**:

   Welcome to the Club!
   Yahoo Inbox

**elizabeth smith** <smithelizabeth270@yahoo.com>

To:jayearl2007@yahoo.com

Fri, Mar 17, 2017 at 5:21 PM

I understand that you had a conversation with Lyndon today.

I'm forwarding this to you, this filed by our friend Jermaine Hopkins.

This suit gives some pretty detailed information about Acevedo's attempt to

become the Chief in San Antonio.

   He also applied to Dallas and did not get selected for Dallas, either.

If I remember correctly, he applied for Dallas in 2015 or 2016.

This suit is interesting because it cites the negligent hiring argument.


ENJOY!

   https://empowertexans.com/wp-content/uploads/2016/11/0riginal-Petition-
_____ 2016-11-19.pdf

   Sent from Yahoo Mail for iPhone



255. Plaintiff recently applied to Rice University for a teaching assignment. Plaintiff believes

   that defendants' negative job reference and criminal investigation caused job rejection.

   Exhibit: Here Incorporated as exhibit:

   On Tuesday, **July 7, 2020**, 03:20:51 PM CDT, jobs@riceworks.rice.edu
   <jobs@riceworks.rice.edu> wrote:


   Dear Dr. Hall,

   Thank you for your application for the Postdoctoral Research Associate | Public
   Humanities/Diluvial Houston | Postdoctoral Fellow in Environmental Justice position in the
   Humanities Research Center department. We wanted to notify you that after careful
   consideration the hiring committee has decided not to move forward with your candidacy.  We

understand that you are considering many other opportunities at this time, and wanted to let you
know so that you may pursue any such openings.

You may receive an additional, automated notification at a later date from our system that the
position has been filled. Unfortunately, we have no way to disable this notification but placed a
greater importance on notifying you of your status as soon as possible.

Again, thank you for your application and interest in working at Rice University.

Best regards,

HR Talent Acquisition Team
Rice University

https://jobs.rice.edu

256. Defendants engaged in fraudulent concealment of material facts throughout their
disqualification conspiracy. Below is a copy of the EEOC investigator's notes showing
the relationship between the ex-wife and the sergeant who was coaching her. This
relationship was omitted from all official internal affairs documents as well as the
criminal investigation being incorporated in the EEOC investigator's investigation.
The documents below show the relationship of the conspirators that defendants
sought to conceal and the tampered promotional list which Ferguson was removed from.
**Here incorporated as exhibits.**

.

Exhibit 1

8/28/95 —

**CAPT.** DAVE eutHer Present w/ CP & Capt Barber.
changed CP's assigned. CP to his admin. staff.

PRIOR COMPLAINTS - "2 with previous Capt. Thompkins.
Thompkins was, removed from Jail & Trans. to
Personnel. removed 1. misappropriated overtime money
2. ERC Council found irregularities
3. ERC Council found same " as CP's complaints.
Officer Ivy (special Projects) called CP at
6:30 am. Told CP he was told to call CP
and remind him of staff meeting. CP worked night shift.
was already been notified.
Bradford, Dodson & Jones - Questioned CP about phone Tapping
allegation.

**★** Tenida Furgeson Adm. Sgt - Spoke with CP's wife who
was involved in a divorce. Renida is chief Dodson's
admin Sgt

LT. Moreno - Capt. Barbers Admin. LT. - Made CP
aware meeting was Taking place.
Relief Lt. Resendez Thompkins was only Lt. Not Present.
married to Capt Thompkins
who was removed
from Jail due to CP's
complaints
LT. MABRY killed (or homicide) CPT. Barber
suffers grievances from LT. MABRY
VA

4-day shift
4-night shift
relief Lt.                                                          0011

Exhibit 2



**Edwards vs. City of Houston**
**Remedial Promotions for Lieutenant by Specific Exam**

Qualifications:

Must have passed Lieutenant promotion given during: 1984, 1988, 1989, or 1991
Must have had the highest ranking of those black Sergeants who did not
promote off of one of those exams.
If named plaintiff passed one of those exams from 84, 88, 89, 91, then the
plaintiff will be placed on the top of this method's list.
One remedial promotion will be given from each list except 1991 in which two
promotions will be given.

| Name: | Employee # | Exam | Rank | Comments |
|---|---|---|---|---|
| ✓ Conway, Bennie G. | ▮ | 1989 | 68 | Plaintiff also on 1991 # 58. |
| ✓ Spencer, Richard M. | ▮ | 1991 | 55 | Plaintiff |
| ~~Ferguson, Renita L.~~ _DROPPED OFF_ _EDWARDS_ | | (1984) | 74 | Listed on exam as Jones,R.L. |
| Hall, John | 77253 | 1988 | 37 | |
| Guidry, Freddy | ▮ | 1989 | 53 | |

_WOODS, Robert_

Note:

Sergeant D.A. Edwards is a named plaintiff and is currently number 13 on the 1992
Lieutenant's exam and therefore will not receive a remedial promotion until such
time as if that 1992 Lt. list expires and she is not promoted. Should this occur
and she not be promoted off this Lt. list then she will be placed on the top of the
next remedial promotion which would cause the last Sergeant to be removed from this
list of remedial promotions. Sergeant Edwards placed # 103 on the 1984 Lt. exam,
placed # 51 on the 1985 Lt. exam, placed # 24 on the 1986, placed # 62 on the 1989
Lt. exam, placed #82 on the 1991 Lt. exam.

The below listed Sergeants where removed off this list when the named plaintiffs
were placed at the top of the list. They are not due any remedial promotions.

Woods, Robert E. ▮   placed # 49 on the 1991 Lt. exam.

Williams, Craig S. ▮   placed # 51 on the 1991 Lt. exam.

JKJ/

113

256. In the exhibit 2 document, Former City Attorney Hall and Police Attorney Craig Ferrel placed and removed Ferguson from Edward's promotional list after the conspiracy was exposed.

257. Plaintiff alleges that the illegal wiretaps, pen registers, and sting ray devices have been used to retaliate against defendants for the past 24 years and to present plaintiff in a false light. Below are three confirmed incidents of where defendants were violating local government code 143.089 (g) rules governing confidentiality. Defendants were aware of "false light" privacy laws but continued to violate them anyway.

258. Defendants violated confidentiality laws by sharing the content of the criminal investigation to citizens, other police agencies, and education institutions. Defendants purpose was to humiliate plaintiff and present him in a **false light**. Based on the following practices of releasing the content of a criminal investigation to citizens, there was no need for defendants to seal evidence to protect plaintiff's right to privacy.

259. Defendants violated plaintiff's constitutional rights of privacy and right to false light privacy were violated when internal affairs sergeant, Hollins, showed  Margie Phelps plaintiff's photo at her home in 2019; internal affairs sergeants showed **Amberley Benitez, leasing agent, at the Vanderbuilt Apts**. 13110 Kuykendall, and when Claude Whitaker, an internal affairs lieutenant, showed the photo to Jean Williams, plaintiff's old neighbor, who lives on Beaver Spring St., Houston, Texas. **Ms. Williams** told me about the incident one day after I stopped by to visit her.  **Margie Phelps, 7634 Langley** St. Houston, Texas. **On June 7, 2018**, I contacted Ms. Phelps to see how she was doing. She ask me to wait because she wanted me to speak to someone. The person who answered the phone was a personal friend of hers' whom I knew as a Houston Police Department **Internal Affairs Sergeant, George Hollins**.

We exchanged pleasantries and he told me of the progress that his son was making as an attorney in the area of criminal justice reform. On June 8 or 9, I went back Ms. Phelps to show her the documents regarding the collusion between Ms. Malveaux and Sergeant Renita Ferguson, the non-investigative IAD sergeant, who was coaching Ms. Malveaux on how to orchestra criminal allegations against me. I also intended to show Ms. Phelps the statements that Ms. Gayland Malveaux made about her own emotional problems.  During the conversation, Margie Phelps stated that all this bedroom stuff should not have been aired in the public. Ms. Phelps told me not to file the open record reply. In addition to releasing photos and confidentiality information to Ms. Margie Phelps, on or around **January 26, 2019**, Jean Williams, my old neighbor, located at 17306 Beaver Spring, told me a story that a member of her church, **Lieutenant Claude Whitaker**, a retired internal affairs investigator, told her which was that I was crazy and was trying to shoot my wife.

260. Plaintiff also found in old boxes stored in his garage a false report alleging domestic violence by AmRent  on **January 22, 2019**. This report was generated by Vanderbilt Apartments located at 13110 Kuykendahl Rd., Houston, Texas 77090. At the time of this event, I was attempting to lease an apartment but was rejected. On or about, February 2, 2011, Amberley Benitez, the leasing agent at Vanderbilt Apts. told me that an HPD investigator came by her office and showed her pictures of me in the nude threatening my ex-wife. This incident implies that the internal affairs division since my retirement in 2004 was continuously unlawfully using wire taps, sting ray equipment, pin registers, and computer hacking to conduct electronic surveillance on me as part of a political cover up that has lasted over 29 years. Everyone has access to the internal affairs tainted file but plaintiff because he was denied his constitutional right to be notified. As mentioned, the May 31, 2018 letter was based on fraud, fraudulent concealment, and an extension of the Houston Police Code of Silence. The purpose of releasing the photo and the

fabricated police complaint by the ex-wife was to discredit me and ruin my career in law enforcement.

261. To date, plaintiff has not read the content or reviewed the evidence associated with the criminal investigation.

262. Below is a copy of the criminal complaint shared with Vanderbilt Apartments: Exhibit: Here **Incorporated is Exhibit**:



February 2, 2011


John E. Hall
17310 Beaver Springs Drive
Houston, TX 77090


Dear Mr. Hall:

In response to your letter dated January 7, 2011, Amrent, Inc., has received your dispute and has completed its investigation of your dispute. Enclosed is a revised consumer credit report showing any corrections or updates. The results of the investigation are as follows:

Criminal Record Battery Domestic Violence – Removed
Public Record: Eviction -Wells Fargo Bank N.A. Trustee Fo vs. John E. Hall, Case No. EV61C0012318 – Confirmed

We verified the eviction public record by contacting the Harris County Justice of the Peace 6, Place 1 (713) 921-1576, and reviewing the case information.

You are entitled to add a statement disputing the accuracy or completeness of the information. Please review the attached documents for additional rights under state and federal law.



Sincerely,


AmRent, Inc.
Consumer Relations Department
1-888-898-6196

263. Plaintiff, as mentioned, alleges that the illegal wiretaps, pen registers, and sting ray device surveillance of plaintiff is unconstitutional because plaintiff has not broken any laws back then, as well as over the years when defendants continued to place him under surveillance. On March 30, 1999, I made an outgoing call to a friend. After they hung up, I hear a voice on my phone that I recognized as Sergeant J. R. Hall, an internal affairs sergeant on the other end of my residential phone. The phone conversation that I overheard concerned a construction project taking place outside and some police officers attending the Captain's birthday party. I called Internal Affairs Division and found out that it was the birthday of Captain Watkins, the internal affairs commander. The content of the above excerpt is from a letter forwarded to Chief C.O. Bradford on August 18, 2002.  This letter shows actual and constructive knowledge that a final policy and decision makers was aware of the illegal surveillance by the internal affairs division.

264. Plaintiff shows that on October 22,2001 a letter regarding the illegal wiretaps and Pen registers were forwarded to Mayor Lee P. Brown, a final policy and decision maker. Exhibt: **Here incorporated as Exhibit**.

OCTOBER 22, 2001


HONORABLE MAYOR LEE P. BROWN
CITY OF HOUSTON
P.O. BOX 1562
HOUSTON, TX 77251-1562


RE: 3212 JACKSON


DEAR MAYOR BROWN,

AS MAYOR OF ALL HOUSTONIANS, I AM REQUESTING THAT YOUR STAFF REVIEW THIS MATTER FOR IMPROPRIETIES. AS YOU KNOW, THE DELICATE BALANCE BETWEEN HOME OWNERSHIP AND URBAN RENEWAL WITHIN THE MIDTOWN SECTION OF OUR CITY IS PLEDGED WITH PROBLEMS AND/OR COMPLAINTS, SOME MORE LEGITIMATE THEN OTHERS.

I BELIEVE THE ABOVE PROPERTY WAS TARGETED FOR SELECTIVE ENFORCEMENT BY THE LEGAL DEPARTMENT OF THE CITY, THE NEIGHBORHOOD PROTECTION AGENCY, THE CITY PLANNING DEPARTMENT, AND THE HOUSTON POLICE DEPARTMENT FOR POLITICAL, ECONOMIC, AND PERSONAL REASONS.

AS YOU ARE AWARE, FORMER MAYOR BOB LANIER GAVE THE HOUSTON RENAISSANCE INC., THE NONPROFIT ORGANIZATION OF REAL ESTATE DEVELOPERS, $3.4 MILLION FROM THE CITY TO SUBSIDIZE 150 AFFORDABLE HOMES IN THE FOURTH WARD. IN 1998, THE ORGANIZATION HAD DEFAULTED ON THE ORIGINAL $3..4 MILLION GRANT FROM THE CITY OF HOUSTON AND OWNED ANOTHER $6 MILLION IN UNPAID LOANS TO THE HOUSTON HOUSING FINANCE CORPORATION. A CURSORY INQUIRY REVEALED THAT CONTRACTS WERE GIVEN OUT WITHOUT COMPETITIVE BIDS, THE PUBLIC WAS BARRED FROM BOARD MEETINGS, AND REQUEST TO INSPECT FINANCIAL RECORDS WERE REFUSED. IN ESSENCE, ABOUT $10 MILLIONS OF THE PUBLIC'S MONEY WAS DISPOSED OF WITHOUT THE

PAGE  2

ORIGINAL GOALS BEING REMOTELY SATISFIED. AS A SEASONED LAW
ENFORCEMENT OFFICER, I ASK YOU WHERE ARE THE HOMES. AND SECONDLY,
WHAT HAPPEN TO THE TAX PAYER'S MONEY. AS WITH THINGS OF THIS SORT,
THE INVESTIGATION RESULTED IN A POLITICAL COVER-UP AND THAT WAS THE
END OF THE MATTER.

MY RELIEF OF DUTY IN 1995, MY WIFE RECEIVING OBSCENE LETTERS, MY WIFE
RECEIVING NEGATIVE JOB REFERRALS FROM THE HOUSTON POLICE DEPARTMENT,
MY TELEPHONE LINES BEING ILLEGALLY TAPPED, FALSE CREDIT ENTRIES
BY MY EX-WIFE, AND THE ABOVE PROPERTY BEING CITED AS DANGEROUS BY
THE CITY LEGAL DEPARTMENT FIT THE SAME POLITICAL SCENARIO. I BELIEVE
THE RELATIONSHIP BETWEEN THE CITY ATTORNEY, ATTORNEY HALL, AND MY EX-
WIFE , GAIL MALVEAUX, WAS EMPLOYED AS THE PIVOTAL COMPONENT OF A
CONSPIRACY TO SERVED THE DUAL PURPOSE OF DISCREDITING AND RETALIATING
AGAINST ME FOR ARTICULATING THE MANIPULATION OF THE EDWARD'S PROMO-
TIONAL LIST. THIS CONFLICT OF INTEREST BY YOUR CITY ATTORNEY WAS THE
CAUSE OF ME BEING RELIEVED OF DUTY FOR SIX MONTHS WHILE THE
HOUSTON POLICE DEPARTMENT INVESTIGATED ME AND MY PRESENT WIFE FOR
A STING SET-UP BY YOUR CITY ATTORNEY, THE HOUSTON POLICE
DEPARTMENT, MY EX-WIFE, GAYLAND MALVEAUX, AND ATTORNEY DON
MCGILBRA, WHOSE WIFE WAS REWARDED WITH A HIGH PAYING JOB ON THE
CITY PAYROLL. YET, MY WIFE, MARIA GUILLORY HALL, CAN VOLUNTEER AS A
CITY WORKER BUT NOT BE OFFERED A JOB WITH THE CITY. NOTE: THE RELA-
TIONSHIP BETWEEN YOUR CITY ATTORNEY AND MY EX-WIFE CAN BE PROVED
BE HIM ALLOWING HIS DAUGHTER TO REPRESENT MY EX-WIFE, GAYLAND
MALVEAUX, PRO BONO IN SMALL CLAIMS COURT FOR VOLUNTARILY
REPOSSESSING A VEHICLE SHE TRIED TO PLACE ON MY CREDIT AFTER FORGING

PAGE  3

MY NAME AS THE CO-SIGNER.

FURTHER WHEN MY EX-WIFE, GAYLAND MALVEAUX, WROTE TWO OBSCENE LETTERS TO ME AND  MY PRESENT WIFE AND TO DAUGHTER'S MOTHER, THE HOUSTON POLICE DEPARTMENT ALONG WITH THE MISSOURI CITY POLICE DEPARTMENT CONSPIRED TO COVER THIS MATTER UP AND TO SHIELD HER FROM CRIMINAL PROSECUTION. IT APPEARS THAT THE CITY CONDUCTS BUSINESS BASED ON A CRITERIA OF POLITICAL FAVORITISM AND SELECTIVE ENFORCE- MENT.

THE RETALIATION CONTINUED WHEN THE CITY'S LEGAL DEPARTMENT, THE HOUSTON POLICE INTERNAL AFFAIRS DIVISION, AND NEIGHBORHOOD PROTECTION OFFICE TAGGED THE PROPERTY AT 3212 JACKSON AS DANGEROUS AS A POLITICAL PLOY. BASICALLY, THEY HAD THE CITY INSPECTOR LIED TO ME BY STATING THAT ONCE I OBTAINED PERMITS THAT THE DANGEROUS BUILDING STATUS WOULD BE REMOVED AND THE CASE DISMISSED AS WITH SIMILAR CASES INVOLVING WHITE PROPERTY OWNERS IN MIDTOWN. . THE CITY EMPLOYEE LIED.

AT PRESENT, THE CITY HAS INFORMED ME THAT THE 3212 JACKSON PROPERTY WHICH WAS BUILT IN 1890 HAS TO BE BROUGHT UP TO CURRENT CITY CODES AND NOT BE ALLOWED TO BE GRANDFATHERED AS A RESULT OF THE DANGEROUS BUILDING STATUS.   I BELIEVE THAT THE REASON THE ABOVE PROPERTY WAS NOT GIVEN GRANDFATHER STATUS WAS SO THAT IT CAN BE USED AS A FORM OF ECONOMIC BLACKMAIL AND/OR RETALIATION AGAINST ME AND MY CURRENT WIFE SINCE SHE SUPPORTED ME WHEN THE POLICE

PAGE  4

MCGILBRA  THAT  RESULTED  IN  ME   BEING RELIEVED  OF  DUTY  FOR  POLITICAL REASONS  RATHER  THAN  ANY  CRIMINAL  BEHAVIOR  ALLEGED  BY  MY  MENTALLY UNSTABLE  EX-WIFE,  GAYLAND  MALVEAUX..

FURTHER,  THERE  IS  THE  ISSUE  OF  ENCROACHMENT  OF  THE  ADJACENT DEVELOPER  ON  MY  LAND.  DID  YOUR  PLANNING  DIVISION  APPROVED  PLANS THAT  ALLOWED  CASPIAN  HOMES  TO  ILLEGAL  ENCROACHMENT  UPON  MY PROPERTY  AND  TO  CONSPIRE  WITH  OTHER  CITY  OFFICIALS  TO  COVER  THIS MATTER  UP.   ENCLOSED  ARE  TWO  DOCUMENTS  WHICH  REFER  TO  A  POSSIBLE ENCROACHMENT  ACROSS  AND  BELOW  MY  PROPERTY  LINE  BY  THE  FORMER RENAISSANCE  DEVELOPER.  WHILE  I  AM  AWARE  OF  MY  LEGAL  RIGHTS PERTAINING  TO  THIS  MATTER   I   FIND  IT  VERY  DIFFICULT  TO  ASCERTAIN  THE TRUTH  WHEN  CITY  OFFICIALS  AND/OR  EMPLOYEES  EMPLOY  THEIR  DISCRETION TO  COVER  THESE  MATTERS  UP.  AS  AN  OUTSIDER,  I  AM  AT  A  DISADVANTAGE; THEREFORE,  I  WOULD  APPRECIATE  IF  YOU  COULD  HAVE  THIS  MATTER INVESTIGATED  TO  ASCERTAIN  IF  ANY  COLLUSION  EXISTED  BETWEEN  THE DEVELOPER  OF  THE  SOUTH  END  LIVE / WORKS  LOFTS  PROJECT  AND  THE  CITY PLANNING  DEPT  WITH  RESPECT  TO  THIS  ENCROACHMENT  ISSUE.   THE  SURVEY WAS  TAKEN  ON  7-18-00.

IF  THE  HOUSTON  POLICE  DEPARTMENT  WOULD  STOP  INTERFERING  IN  MY  REAL ESTATE  AFFAIRS,  I  WOULD  HAVE  BEEN  FURTHER  ALONG  WITH  MY  DEVELOPMENT PROJECT.   THEIR  INTERNAL  AFFAIRS  INVESTIGATIONS  ARE  POLITICALLY  AND RACIALLY  MOTIVATED.   IT  AMAZING  ME  HOW  THE  POLICE  DEPARTMENT  FAILS TO  INVESTIGATE  THE  THREE  MILLION DOLLARS  MISAPPROPRIATED  JAIL  OVERTIME BUDGET(S)  AND  THE   TEN  MILLION  DOLLARS  RENAISSANCE  DEVELOPER

PAGE   5


MISAPPROPRIATED PUBLIC FUNDS; YET, CAN EXPEND THE DEPARTMENT'S RESOURCES ON THE PERSONAL AND THE BUSINESS AFFAIRS OF A LOWLY LIEUTENANT WHO SPENDS HIS TIME WORKING. THERE WOULD BE NO NEED FOR THIS LETTER IF ANTHONY HALL AND THE POLICE DEPARTMENT STAYED OUT OF THE PERSONAL AFFAIRS OF CITY EMPLOYEES.


I APPRECIATE YOUR ASSISTANCE AND WILL CONTINUE TO SUPPORT YOU,


LT J. EARL HALL
2710 PECAN CT
MISSOURI CITY, TX. 77459

265. Plaintiff claims that the May 31, 2018 letter from Chief Acevedo confirms that the Internal affairs division was conducting illegal wiretaps and pen registers.

266. Plaintiff, who was under a collective bargaining agreement, claims that defendants engaged in an ongoing conspiracy of discrimination and retaliation by failing to notify plaintiff of wiretap, pen register, sting ray investigations associated with a (false) criminal complaint as referenced in the May 31, 2018 letter by the police attorney and approved by Chief Acevedo. As a result of defendants' failure to notify plaintiff, there was never a date when the criminal investigation ended, nor a time when the retaliation stopped. Defendants continued to share the content of their criminal investigation to police agencies and others for 24 years in order to present plaintiff in a "false light" by fraudulently concealing material facts of their conspiracy. Based on defendants unlawful actions, Plaintiff was deprived of his constitutional rights under the first, fourth, fifth, sixth, and fourteenth amendment which resulted in loss of employment, interference in employment contract(s) formulation, terms, conditions, and enjoyment, damage to reputation, intentional infliction of emotional distress, humiliation, embarrassment, pain, suffering, mental anguish, inconvenience, loss of enjoyment of life, loss of earning, and loss of future earnings due to defendants' failure to notify him of the final disposition

date of the criminal complaint. Since there was no final disposition date,

plaintiff was subject to "double jeopardy" every time the content of the

criminal investigation was shared. Defendants used the criminal investigation

as retaliation and as a distraction from the originate crime which triggered the

Conspiracy. The "real" crime that triggered the conspiracy was when the

former City Attorney Anthony Hall perpetrated **Fraud on the Court** by

tampering with the Federal Judge's promotional list by placing and approving

a non-qualifying co-conspirator on the list to replace plaintiff.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief against Defendants:

A. Plaintiff seeks Compensatory damages in an amount which is fair, just, and reasonable; Defendants' qualifications for Chief of Police are based on the following training and academics: Bachelor degree average of 120 credit hours, Master's degree average of 60 credit hours, Phd. degree average of 120 credit hours, Law degree average of 90 credit hours, FBI training school, 5 months.  Chief Jimmie Dotson was promoted from sergeant to Assistant Chief and held a bachelor degree (120 credits hours), Chief C.O. Bradford was promoted from sergeant to Assistant Chief and held a bachelor degree and law degree (210 credit hours), Chief C. McCelland was promoted from lieutenant to Chief of Police (Bachelor credit hours acquired Masters after promotion credit hours 180), Chief Dirden was promoted from lieutenant to Assistant Chief (Bachelor credit hours and law degree 210 credit hours); In comparison, Plaintiff has bachelor, two masters, and a Phd. degree 360 credit hours.  Plaintiff claims that if it were not for defendants conspiracy to violate his constitutional rights; then, he would have had

126

a lucrative and success career in law enforcement. Therefore, plaintiff believes that compensatory damages to his career is worth nine millions dollars in order to make him whole. Defendants denied plaintiff the opportunity to go to the F.B.I. academy.

B. Punitive and/or exemplary damages in an amount which is fair, just, and reasonable; Plaintiff believes that the Jury should add punitive damage to the compensatory damages by **tripling** the compensatory damage to prevent the callous, indifference, and malice state of mind of defendants for violating the law.

C. Entry of a declaratory judgment stating that Defendants' policies, practices, acts and omissions described in this Complaint violated Plaintiffs' rights guaranteed to him by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.; Plaintiff seeks injunctive relief from any future violations of his constitutional rights by defendants using illegal wiretaps and pen registers to invade his privacy.

D. That the Court permanently enjoin Defendants, their officers, agents, employees and successors in office, as well as, those acting in concert and participating with them, from engaging the unlawful practices described in this Complaint; and

E. Such other and further relief as this Court may deem appropriate,

including costs, interest and reasonable attorney fees pursuant to 42
U.S.C. § 1983, Civil Rights Act of 1964, Intentional Infliction of

Emotional Distress, Fraud, 42 U.S.C. 1981, 42 U.S.C. 1985.

**JURY DEMAND**

NOW COMES Plaintiff, John E. Hall, Pro Se, and hereby continues his
demand for a trial by jury in this matter.

Respectfully submitted,

John E. Hall, Pro Se

AKA

Dr. John "Jay" Hall

17818 Running Brook Ln

Spring, Texas 77379

832-886-9370

Email: Jayearl2007@yahoo.com

**INVENTORY OF EVIDENCE EXHIBITS MENTIONED AND INCORPORATED**

**BEARING ON DISCRIMINATION AND RETALIATION BASED ON RACE**

| ITEM | PAGE | SYPNOSIS |
|------|------|----------|
| 31 | 11 | May 31, 2018 letter informing plaintiff of criminal investigation |
| 136 | 29 | Houston Chronicle (2011) audit of IAD |
| 138 | 32 | Plaintiff's letter to Chief Nuchia 1994 |
| 144 | 37 | Dan Morales AG informs Chief Bradford of open record violations |
| 145 | 39 | Dan Morales AG informs Chief Bradford to release all internal affairs records |
| 146 | 47 | Roland Bienvenu, Human Resource, claims no record of plaintiff's relief of duty |
| 152 | 49 | Open Record Email claiming complainant made an IAD complaint not a Police report (June 11, 2020) |
| 188 | 57 | Mentioned Impact Mortgage Company and Police Informant Blacknall |
| 198 | 58 | Mentioned computer hacking of Capella University assignments |
| 191 | 59 | City of Houston certificate of residence 3212 Jackson |
| 197 | 60 | San Jose job interference of employment contract (2006) |
| 200 | 61 | IAD computer hacked medical records |
| 201 | 61 | IAD computer hacked interfere with research study participants |
| 202 | 62 | Miki Barber stopped paying lease after two white HPD officers came by |
| 210 | 63 | IAD interfered with neuroscience training at NOBLE |
| 211 | 63 | IAD interference with Latin Police Organization |
| 215 | 64 | Dr. Pope providing illegal audio clip for research |
| 222 | 64 | Co-conspirator Ferguson involved in foreclosure scheme 6339 Ludington |
| 224 | 65 | Miki Barker phone texts of two white HPD officers instructing her to stop playing the mortgage  (Incorporate in document). |
| 224 | 67 | Email of Housing Discrimination Complaint Quicken Loans (professional gambler) |

| 229 | 69 | OSO SCS credit collection entry (fraud) to prevent plaintiff from receiving financial aid |
| 230 | 70 | Slandered by Eva Grant property investor and mortgage holder 2710 Saddle Creek Dr. |
| 231 | 70 | Divorce Financial Sheet (Incorporated) |
| 232 | 73 | Malveaux and Ferguson meetng at President and First Lady's Gym to conspire at plaintiff |
| 234 | 76 | Malveaux and Levingston conspire and forward plaintiff obscene letter |
| 235 | 80 | IAD detective investigator investigating obscene letter arrested by FBI one month for kidnapping another officer's wife to extort money (incorporated) |
| 239 | 84 | EOS CCA refund check (incorporated) confirmed fraudulent credit entry |
| 240 | 85 | Computer hacking of Capella University assignment Dr. Meredith (incorporated) |
| 241 | 86 | Capella Test Discrimination (incorporated) Possible IAD involvement |
| 242 | 87 | Dr.Pope's email and fraudulent audio clip in violation of Capella research (incorporated) |
| 243 | 89 | IAD hacking into medical records at Capella University (incorporated) |
| 244 | 91 | Computer hacking research participants emails Lou Reiter (incorporated) |
| 245 | 92 | Hispanic Police Organization refused to participate in research (Acevedo/Garcia members) |
| 246 | 95 | Dr.Belley fraudulent IAD letter involving Director of Planning Position (incorporated) |
| 247 | 97 | Email from Sandra Weller, Texas Department of Saving and Mortgage, proof that confidential HPD informant, have no real estate license to do three mortgage loans for plaintiff (incorporated). Copy of Impact Funding letter concerning Blacknall's mortgage fraud and IAD framing me. |
| 248 | 99 | Computer email hacking of the Dr. Boyd a neuroscientist that I was contacting to assist me with developing a neuroscience course for police and |

|   |   | citizens.  (incorporated) |
|---|---|---|
| 250 | 102 | Applied for a teaching position at American International University (rejected) after background check with Turner.  (incorporated) |
| 251 | 104 | Applied for Houston Police Chief position. Computer hacking of email (incorporated) |
| 252 | 107 | Computer email to Council women Stardig, on Criminal Justice Committee No response.  (incorporated) |
| 254 | 109 | Email from couple in Austin, Tx. forwarding me a dirty file on Chief Acevedo. Couple's intention was to use me as the scapegoat as a disgruntle police chief  applicant. I believe this couple was working with IAD. (incorporated) |
| 255 | 110 | Rice University rejection for professor position 7-7-20  (incorporated) |
| 256 | 111 | EEOC investigator's notes showing conspiracy between Ferguson and Malveaux. This conspiratorial relationship was omitted from official Internal affairs complaints or Houston Police administrative letters. (incorporated) |
| 256 | 114 | Copy of the tampered promotional list where Ferguson was placed illegally and removed once conspiracy of disqualification of plaintiff was exposed. (incorporated) |
| 259 | 114 | Local government code "False" light and confidentiality of IAD violated. IAD Investigators show criminal investigation information to public (Phelps, Williams, and Benitez). |
| 262 | 116 | Copy of criminal complaint provided by AmRent on Plaintiff when he applied for an apartment  (incorporated) |
| 264 | 118 | Copy of letter to Mayor Brown advising him of the illegal wire taps and pen registers and conspiracy by ex-wife. Brown was a final policy and decision maker who acted indifference and failed to respond (incorporated) |

**P**

US POSTAGE AND FEES PAID
PRIORITY MAIL
Nov 02 2020
Mailed from ZIP 77379
4 lb PM Zone 1

12541357
CommercialBasePrice



0628001038948B

## PRIORITY MAIL 1–DAY

J. hall
17818 running brook ln
Spring TX 77379

| B050 | 0025 |

**SHIP TO:**
CLERK OF THE COURT
DAVID J BRADLEY
PO BOX 61010
HOUSTON TX 77208–1010

## USPS TRACKING #



9405 5118 9956 4393 3217 66

 SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

United States Courts
Southern District of Texas
FILED

NOV – 2 2020

David J. Bradley, Clerk of Court